Commonwealth of Pennsylvania *v.* Jermyn et al., Appellant.

456

Argued October 22, 1930.

Before
TREXLER, P. J., KELLER, LINN, GAWTHROP, CUNNING-
HAM and BALDRIGE, JJ.

*William A. Gray,* and with him *Edward J. Kelly* and
*Clarence Balentine,* for appellant.

*J. Julius Levy,* and with him *John J. Owens,* for
appellee.

OPINION BY GAWTHROP, J., December 27, 1930:

The indictment, found January 8, 1930, charged
Edmund B. Jermyn, James Arigoni, James W. Hen-
shaw, Harry J. Friend, Edward G. Miller, and other
persons unknown to the grand jury, with conspiring
to set up and establish in the City of Scranton,

gambling devices—slot machines—in violation of Sections 55 and 56 of the Act of March 13, 1860, P. L. 322, and its supplements. Jermyn was, at the time of the commission of the offense charged, the mayor of the City of Scranton; Arigoni was the director of public safety of the city; Henshaw was the superintendent of police of the city; and Friend was a member of the civil service commission of the city. The circumstances of the finding of the bill of indictment were these: In November, 1929, about six weeks before the end of Jermyn's administration as mayor, there was presented to the president judge of the court below the petition of Henshaw, superintendent of police, for the destruction of certain slot machines that had been seized. Whereupon, the learned judge began an investigation to determine the ownership of the seized gambling devices for the purpose of imposing on the owner or possessor "such reasonable costs and charges to the seizing officer as they shall deem adequate and just," pursuant to the 60th Section of the Statute of 1860, supra. As a result of this investigation the judge charged the grand jury to investigate the subject of the operation of slot machines in the City of Scranton. The indictment in the record, found January 8, 1930, is based upon a presentment of the grand jury which followed this investigation. On January 21, 1930, Arigoni and Henshaw pleaded nolo contendere. On April 4, 1930, Miller pleaded guilty. When the case against Jermyn and Friend was called for trial on April 7, 1930, they pleaded not guilty and the trial resulted in their conviction. They severally appealed. We have in this case the appeal of Edmund B. Jermyn.

The specifications of error are very numerous, but a careful examination of them has convinced us that the alleged errors complained of are properly embraced under the following three general heads: (1)

The evidence adduced by the Commonwealth was insufficient to sustain a verdict of guilty as against appellant; (2) the court below erred in admitting certain evidence offered by the Commonwealth and in refusing to admit certain evidence offered by appellant; (3) the charge was erroneous and prejudicial to appellant.

It appears from the evidence that Jermyn was elected mayor of Scranton in November, 1925, and held that office from the first Monday of January, 1926, to the first Monday of January, 1930. During this term Friend served, under appointment of the mayor, as a civil service commissioner of the city. The Commonwealth's contention was that appellant, while he was mayor, conspired with Arigoni, Henshaw, Friend and others, to permit and assist Miller to maintain and operate in the City of Scranton a number of slot machines for gambling purposes. Miller took the stand for the Commonwealth and testified in substance as follows: He had been running slot machines in Scranton for the last three years. Shortly after Jermyn "went in office ...... I went in. He was in the office. I told him that I was interested in machines. Q. Interested in slot machines, did you tell him? A. Yes, sir, he asked me my name. I told him. He said, 'you had better get to hell out of here and see Mike McHugh.' " (His opponent at the election.) In January, 1927 he met Friend, whom he had known for two years, at the latter's office and asked him "if he could do anything about putting the machines out." Friend replied that he would find out and told Miller to come back again. About three months later Friend told Miller "to go ahead and put the machines out." Miller agreed to pay Friend $4 per day for each machine which he (Miller) placed in operation. At first five machines were placed in various stores in the city, the proprietors of which

received one-half of the revenue produced by the machines and Miller received the other one-half. "Q. What were you paying these $4 per day per machine for? A. For protection." Eventually Miller placed in operation twenty-eight slot machines. Each week, on Tuesday, he saw Friend and gave him the money from the machines, together with a slip of paper showing the names and addresses "where the machines were out." The amounts paid to Friend by Miller for the twenty-eight machines varied from $718 to $740 per week, the amount depending upon the number of machines in operation. "Q. Did you have any talk with Mr. Friend as to what he was doing with the money that he was receiving from you? A. He kept a dollar and three dollars went to City Hall. Q. Did he tell you who at City Hall he was paying it to? A. No, sir." After March, 1928, Miller made his payments to one Fred Pride instead of to Friend, the latter having told Miller that he desired this change in the arrangement because he was "afraid something would happen." In March, 1929, Miller took down all of his machines for about two weeks because of a threatened raid by the city police, notice of which was communicated to him by Pride. He also furnished to Pride a list with the names of the places where the Miller machines were in operation. Pride told him that he (Pride) gave all the money he received from the machines "to the mayor." On one occasion he went to see Pride on a farm near LaPlume, on the Lackawanna Trail, where Pride told him "that the mayor was just here and says to take the machines down." The reason stated by Pride for taking the machines down was "on account of the grand jury going in session," in September, 1929. Miller operated slot machines until November, 1929, covering a period of two years and six months. During that time but three of his machines were seized by the city

police. This occurred during the time he was paying Friend, and the amount of the fines paid by these three operators was deducted from the amount due Friend and was returned by Miller to the operators. The last time he talked with Friend was about the first of the year 1930, when he told Friend that he had been going to Judge NEWCOMB and perjuring himself and that he felt that he should get some help "to pay for a couple of good lawyers, and keep them out of it." Friend told him to see Pride. Pride told him to see Friend. He offered to take $10,000 and get out of the country for two years, but Friend would not "do business" with him. He afterwards went before Judge NEWCOMB and told the story he told in the court room, notwithstanding the fact that he had on numerous occasions sworn before Judge NEWCOMB, in the preliminary investigation, that he paid nobody for protection and had no business with Friend.

Miller's testimony was corroborated in part by that of the Commonwealth's witness, Cecci, to the effect that he was steadily employed by Miller from May, 1928, to November, 1929; that his duties were to repair Miller's slot machines and collect the money from the machines and turn it over to Miller, together with slips showing the amount of money taken from the machines; and that frequently, at Miller's direction, he called the proprietors of Miller's slot machines on the telephone and told them to take the machines down, and later notified them to put them up again.

The Commonwealth also introduced the testimony of numerous maintainers of slot machines to the effect that comparatively few of the slot machines owned by Miller were seized by the police during the years of 1928 and 1929; that those who maintained them were "tipped off" when there was to be a raid

on slot machines; but that machines owned by others than Miller were usually seized by the police after being in operation for only a short time.

Chris Rose, a witness for the Commonwealth, who was superintendent of police under Mayor Jermyn from January 4, 1926, to August 1, 1926, testified that he issued a general order to the police to raid slot machines in the city—"to make a search of all machines on their beats and bring them in;" that he did not consult the mayor about such order; and that he retired from the police department on a pension in August, 1926, at the age of forty-nine years, at the request of Mayor Jermyn.

The Commonwealth offered in evidence an ordinance of the City of Scranton, establishing a bureau of police in the department of public safety of the city, the second section of which provides as follows: "The chief executive officer of the bureau of police shall be the superintendent of the bureau of police. He shall be subject to the orders, rules and regulations of the director of the department of public safety and all orders to the superintendent of the bureau of police shall emanate from and be issued by the director of the department of public safety." The contention of the Commonwealth was that Jermyn, in his official capacity as mayor, despite the provisions of this ordinance, appropriated to himself the authority of deciding when raids on slot machines should or should not be made by the city police.

Arigoni, who was appointed director of public safety July 2, 1926, and served to January 1, 1930, testified that about a year after he became director of public safety, or approximately in the middle of the year 1927, he heard that there were numerous slot machines in the City of Scranton; that he went over and took the matter up with the mayor and told him that "I was asking the police to bring me a report

of the number of machines; and I was there instructed when I got those reports to take it up with the mayor.'' He testified that when he got the reports from the chief of police he would go to the mayor and say: ''Here are the reports furnished me by the different police;'' and the mayor would reply, ''I will see you later,'' or ''I will see you again,'' ...... ''I would go back to see him in a little while, might be an hour or two and he would then tell me to go out and knock them off ...... If he would say to me 'I will see you again' then I would used to wait until he would send for me. Q. Whether at any time that you brought in a list of machines that the mayor said: 'Go out at once and raid?' A. Not that I can recall.'' He continued: ''I could not go out and make a clean up on slot machines before I would consult the mayor.'' ''Q. Why couldn't you do that? A. Because, as I said before, when I first got rumors about machines I took the matter up with the mayor and he then informed me: 'before you go out to make spectacular raids, take the matter up with me.' I did.'' He testified further that whenever he received a complaint from anybody about a single slot machine in any place he immediately sent the police out to seize it without any orders, but that when the police went out to ''knock off'' machines mentioned in a list which had been submitted to the mayor, they did not find any. When Arigoni was asked whether he knew Fred Pride he said that he met him about two years before the trial at a horse race and was introduced to him by Mayor Jermyn.

Superintendent of police Henshaw testified that when he received reports as to slot machines from the policemen, he took them to Director Arigoni; that Arigoni had instructed him not to make raids on slot machines without receiving an order from him; that sometimes when only two or three machines were

reported Arigoni would tell him to get the machines, but that when a great number of machines were reported the director never ordered him to raid the machines immediately, but took the reports and held them, stating that he would let him know when to make the raid.

Harry Davis, captain of police during Jermyn's administration until April 15, 1929, testified that superintendent of police Rose issued a general order to the policemen to clear the slot machines out of the city, but that after Captain Henshaw was appointed the orders in reference to slot machines were to wait for orders from Henshaw before making any raid.

Albert Gleason, who became a captain of police of the City of Scranton May 1, 1928, testified that he furnished reports to Chief Henshaw showing where slot machines were located in the city, and that his orders from Henshaw were to wait for an answer.

The defendant, Jermyn, testified that he was not acquainted with Miller and never saw him before the trial, except on the day Miller called at his office at the beginning of his administration and introduced himself and said: "I am interested in slot machines. I wasn't for you in the last election. I was for McHugh. I thought I would come up and see if I could do a little business about putting out the slot machines in this administration;" that he (the mayor) told Miller that he could not get protection or permission, but that if he put up machines he (the mayor) would get everyone he could get; and that Miller went out of the office and he never saw him afterward until he took the stand at the trial. He testified further that he never knew of, nor was concerned in, any agreement or understanding between Miller, Friend, Arigoni or Henshaw with regard to protection to be furnished by the police department, or any of its members, for slot machines of Miller, or

any other person; that he never withheld orders from Arigoni or Henshaw to prevent them from seizing slot machines; that Arigoni never left with him a list or report showing the names of persons said to be operating slot machines in the city; that from time to time Arigoni came to his office with such a list, but he always took the list away with him; and that on these occasions he always said to Arigoni: "Go knock them off; get them;" and that when the policemen were ordered to seize the machines listed "invariably they would never come back with over fifty per cent. of the machines, at the most. Now how they got word, or how they took them down, that's beyond me."

The defendant Friend did not take the witness stand.

The able counsel for appellant concede in their brief that it may be taken to be established by the evidence that there existed a conspiracy to permit gambling machines to be operated in the City of Scranton during the Jermyn administration as mayor. But they earnestly contend that the evidence wholly fails to establish that appellant played any part in the conspiracy. The theory of the Commonwealth was that Miller's slot machines were protected from police interference; that the mayor furnished this protection by taking from the director of public safety, and personally exercising, the power of deciding when the city police should make raids on slot machines; that he never permitted his police force to make a raid pursuant to the reports furnished to him by Arigoni until after a delay sufficient to enable Miller to receive notice and take down his machines before the police could seize them; and that this condition of affairs is consistent only with the conclusion that the mayor was a party to the criminal conspiracy charged. Miller's machines enjoyed almost complete immunity

from police interference for two and one-half years. The mayor admitted that whenever the policemen were ordered to seize the machines listed in the reports submitted to him by Arigoni "invariably they would never come back with over fifty per cent. of the machines." But he did not testify that he ever undertook to find out the cause of this condition. We are of opinion that the questions whether the defendants, Jermyn and Friend, or either of them, were parties to the conspiracy charged were for the jury, and that the evidence was sufficient to sustain the verdict against each of them. Where the acts of parties show that they are evidently acting in concert, in pursuance of a common design and for the accomplishment of a common purpose, the jury may be permitted to infer that such concerted action is the result of an agreement between the parties so acting: Com. v. Snyder, 40 Pa. Superior Ct. 485. The conspiracy charged need not be formed by express words. It is not necessary that each of the conspirators should have seen any of the others. The joint assent of minds required to sustain a charge of conspiracy may be inferred from facts which establish to the satisfaction of the jury beyond a reasonable doubt that the conspiracy had been formed. The evidence that there existed in the City of Scranton in the Jermyn administration a conspiracy whose purpose was to operate slot machines is overwhelming. That the operations under the conspiracy resulted in a discrimination in favor of Miller's machines is convincing. We agree with the court below that the evidence furnishes no justification for judicial interference with the verdict.

Appellant complains that he was prejudiced by proof of corruption on the part of certain police officers in failing to seize slot machines which they knew were being operated. This complaint is based on objections to the testimony of Commonwealth's

witnesses, Ferguson, Savas and Callahan. Ferguson testified that he maintained one of Miller's machines in his store for more than a year; that the police saw it; and that it was never taken by them, although his place was raided as a tippling house and he paid a fine for that offense. Savas was allowed to testify that he maintained a slot machine which did not belong to Miller and was arrested by the police for keeping a gambling device. Callahan testified, over defendant's objection, that he maintained a Miller machine which was not seized by the police, and that the policemen on the beat played it. The testimony was relevant and competent as tending to prove that the police of the city had knowledge of the places where slot machines were in operation, and that they did not seize the Miller machines but did seize those belonging to others. The evidence tended to support the Commonwealth's theory that the Miller machines enjoyed immunity from police interference.

The next contention of appellant is that the court erred in permitting the Commonwealth to prove that slot machines were being operated in Scranton during that part of his term which preceded February 25, 1928, which was the time when the indictment charged that the conspiracy began. The evidence which is the subject of this complaint is that of the witness Roth, who testified that he examined all of the police dockets of the City of Scranton (which previously had been identified by the police magistrate who kept them) covering the period from January 1, 1926, to December 31, 1929, in reference to the arrests made by the city police for keeping gambling devices, and that the examination disclosed that the number of arrests made in the year 1926 for that offense was sixty-one; that for the year 1927 there were twenty arrests; for the year 1928 there were fifteen arrests; and for the year 1929 there were thirty-five arrests.

This evidence was offered together with the dockets from which the witness secured his information. The purpose of the Commonwealth in introducing evidence of the number of arrests of slot machine operators from the beginning of appellant's term to the date of the inception of the conspiracy charged was not to prove that the operation of slot machines in the city began with appellant's service as mayor, or that it was due to his connivance. The purpose was to establish the fact that after the inception of the alleged conspiracy to protect Miller's machines, there was a substantial decrease in arrests of persons operating slot machines. In the light of the evidence that the mayor inaugurated a change of policy of the police department in respect to slot machines by taking unto himself the control of the director of public safety in the matter of raids upon them, we are of opinion that the learned trial judge committed no error in receiving this evidence, and that it was relevant and competent for the purpose for which it was offered. Com. v. Clay, 56 Pa. Superior Ct. 427, relied upon by appellant, is not an authority to the contrary. In that case Clay, who was the director of public safety of Philadelphia, was charged with conspiring with others to cheat and defraud the city by letting certain contracts to Wiggins & Company. The Commonwealth was permitted to prove that during a period prior to to the inception of the conspiracy charged Clay awarded forty-two contracts to Wiggins & Company, but there was no offer by the Commonwealth to show that there had been any fraud, irregularity or suspicious circumstance in connection with the letting of these forty-two contracts. It was held that, as there was no evidence of any fraud or irregularity in connection with these contracts, the evidence was inadmissible as tending to establish a system and to show that the acts charged in the indictment were part of

a series of frauds intentionally committed; and that the jury was wrongfully permitted to draw an inference of guilt from proof of facts in connection with which no proof of guilt was shown to exist. In the present case the jury was permitted to predicate nothing on the fact that slot machines were in operation during the period of the Jermyn administration preceding the inception of the conspiracy. The theory of the Commonwealth was that the warfare of the police department against slot machines relaxed only after the inception of the conspiracy to protect Miller's machines. The records of seizures of slot machines by the police department, showing a material decrease in arrests of persons operating slot machines, is some evidence of such relaxation.

It is urged further in respect to the testimony of the witness, Rose, that he was incompetent to testify as to what the dockets and other records of police Magistrate Pierce showed in respect to the number of arrests made for maintaining slot machines during each year of the Jermyn administration. As the records themselves had been properly identified and were offered in evidence there seems to be no sound objection to the testimony of the witness, which amounted merely to a summary of the contents of the records on the subject.

The next complaint is that the court below erred in refusing to allow the defense to prove that gambling devices were operated in Scranton for many years prior to the time when appellant became mayor. It is urged that the evidence was admissible to rebut the inference that appellant was responsible for the introduction of slot machines in the City of Scranton. As already stated the Commonwealth offered no evidence for the purpose of showing, and did not contend, that appellant was responsible for the introduction of slot machines into Scranton. It follows that

defendant's offer was not in answer to the Commonwealth's evidence or its theory of the case. The evidence was wholly irrelevant to the issue and the exclusion of it was proper.

The court permitted the Commonwealth to introduce an ordinance of the City of Scranton entitled, "An ordinance establishing a bureau of police in the City of Scranton and providing for the government thereof," etc., for the purpose of showing the duties of the mayor, the director of public safety and the superintendent of police. The ordinance does not relate to the duties of the mayor. The contention is that it was error to receive the ordinance in evidence, because it contains no reference to the duties of the mayor. The record shows that the information which the jury got as to the contents of the ordinance was limited to the instruction in the charge of the learned trial judge that the ordinance "defines the duties of the head of the department of public safety," and provides that "the chief executive officer of the bureau of police shall be the superintendent of the bureau of police. He shall be subject to the orders, rules and regulations of the director of the department of public safety, and all orders to the superintendent of the bureau of police shall emanate from and be issued by the director of the department of public safety." The jury were not told by the court, and could not have understood, that the ordinance referred to the duties of the mayor. The argument that the jury was asked to convict the mayor on the theory that he neglected duties imposed by this ordinance is not supported by the record. The effect of the admission of the ordinance in evidence was merely to establish that the authority to control the city police was in the director of public safety and not in the mayor, and that the mayor's taking into his own hands the control of the

raiding of slot machines was an assumption of authority. The admission of the ordinance was not error.

When Arigoni was on the stand the district attorney asked him who had introduced him to Pride, the defense objected to the question as immaterial and assigns for error the overruling of the objection which resulted in the answer that the mayor introduced the witness to Pride. The evidence was not immaterial. When two men are jointly accused of co-operating in the commission of conspiracy to commit a crime, evidence of their previous acquaintance is competent and material, although the fact that they participated in the conspiracy may not be predicated upon such testimony alone.

The Commonwealth was permitted to prove by the witness, Chris Rose, who was superintendent of police during the first seven months of the Jermyn administration, that the mayor requested him to resign and take a pension, to which he was entitled by reason of his twenty-five years of service. It is urged that it was error to admit this evidence and allow the jury to draw from it the inference of guilt, because it does not appear that Rose was removed from office for an improper reason. In the light of the testimony that Rose had issued orders to all the policemen to search for slot machines on their beats and bring them in, and the evidence that after Henshaw succeeded him the orders to the police from the mayor were to "wait for orders," the fact that the mayor removed Rose from office was a proper one to be considerd by the jury in determining whether the mayor was a party to the conspiracy charged.

When Henshaw, superintendent of police, was testifying he was asked whether during his term any information or warrant was issued against the operator of a gambling device and, over objection, answered that he did not know. The admission of this evidence

requires no discussion as it was not prejudicial to appellant and was at most harmless error.

The court below permitted Miller to testify, over appellant's objection, that when he paid the money to Friend the latter told the witness that he (Friend) kept a dollar and that "three dollars went to City Hall," and that when he paid the money to Pride the latter told the witness that he (Pride) gave the money "to the mayor;" and that on another occasion Pride told the witness to take down the machines and that "the mayor was just here and says to take the machines down." It is urged in behalf of appellant that Miller's testimony as to what Pride and Friend had told him is hearsay and, therefore, was inadmissible against him. We cannot adopt this conclusion. The general rule is that where several persons have conspired together to commit an unlawful act, the acts and declarations of the members of the conspiracy done or made during the existence of the conspiracy and in furtherance of its objects are original evidence against all the others, and that such evidence is not to be excluded as hearsay. See 3 Ency. of Ev., p. 417; Com. v. Spardute, 278 Pa. 37; Com. v. Zuern, 16 Pa. Superior Ct. 588. "That the accused was not present when the declaration, which is introduced against him, was uttered by a fellow-conspirator does not of necessity render it incompetent if it conforms to the rule in other respects": Underhill on Criminal Evidence, 2d Ed. Sec. 413, p. 799. The question whether or not proof of the conspiracy shall precede the admission of evidence of acts and declarations of supposed co-conspirators is merely one of order of proof, which is a matter largely in the discretion of the trial court: 3 Encyl. of Ev., p. 425; Com. v. Zuern, supra. It is enough that there is some evidence of a conspiracy already introduced and an offer to produce further evidence: 3 Encyl. of Ev., p. 426. It

has been held that declarations of parties to a conspiracy, relating to the disposition of the fruits of the conspiracy, are examples of declarations admissible in evidence against all the parties to the conspiracy. See 3 Encyl. of Ev., p. 432. In the case at bar Pride was a co-conspirator according to Miller's testimony, although he was not named in the indictment. Evidently he was one of the "other persons at present unknown," mentioned in the indictment, with whom appellant was charged with conspiring. It was held in Clune v. U. S., 159 U. S. 590, that evidence of the acts and declarations of two persons who were not parties to the record in carrying or attempting to carry into effect the conspiracy was admissible against the defendants if they were engaged in the conspiracy with defendants and their acts and declarations were in execution thereof. The rule was clearly and succinctly stated by the learned trial judge in his opinion as follows: "It is the proof and not the charge of such criminal agency that makes the declaration of a co-conspirator admissible." The testimony of Miller as to what Pride said he did with the fruits of the conspiracy became admissible against appellant when the Commonwealth produced the evidence, which we have already reviewed, connecting appellant with the conspiracy. It follows that the evidence was properly admitted and that it would have been error to strike it out.

The next proposition urged upon us is that the Commonwealth was permitted to prove by a number of operators of Miller's slot machines that they were not seized by the police, and also to prove by the maintainers of machines which did not belong to Miller that these machines were seized shortly after they were put in operation. The purpose of the introduction of the evidence was to establish that the Miller machines were protected by the police, but that

the machines owned by others were not protected by them. Appellant urges that the evidence was insufficient in quantity to prove the point, because it does not appear that the Commonwealth called substantially all the persons who operated slot machines in the city. We are fully persuaded that the evidence presented was sufficient and competent to warrant a finding by the jury that the Miller machines were quite generally immune from interference by the police.

The remaining complaints refer to the charge. As only a general exception to it was taken, only basic fundamental error should be considered: Com. v. Taylor, 78 Pa. Superior Ct. 386.

It is urged that there was error in the portion of the charge defining a "reasonable doubt." This criticism is leveled at the following statements in the charge: "Now, a reasonable doubt is not a fanciful or an imaginary doubt ...... It must be a substantial doubt, such a doubt as would prevent reasonable men from coming to a conclusion, that is, to a definite conclusion, on any of the weighty affairs of life. It means proof to a moral certainty, such proof as satisfies the intelligence of the jurors to such an extent that they can with a clear and untroubled conscience pronounce the defendant guilty as charged in the indictment ...... If your intelligence and reason are so profoundly convinced of the defendants' guilt that you can act upon that conviction with a clear and untroubled conscience without any substantial hesitation, then you should return a verdict in accordance with that conviction."

The first contention of appellant is that it was error to charge that it must be such a doubt as would prevent one from coming to a conclusion on any of the *weighty* affairs of life. It is urged that there was error in using the word "weighty." We are not persuaded that this complaint has merit. Chief Justice

MOSCHISKER stated recently in Com. v. Green, 292 Pa. 579, that "the juror should be warned that he ought not to condemn unless he is so convinced by the evidence that he would venture to act upon that conviction in matters of *importance* to his own interest," citing Com. v. Andrews, 234 Pa. 597, 608. The phrase "a matter of importance" was used by Justice AGNEW in defining reasonable doubt in Com. v. Drum, 58 Pa. 9, 22. In Com. v. Webb, 252 Pa. 187, 194, a trial for murder, in which the instruction was that the doubt must be one which would cause hestitation "about taking action upon *any important affair of life,*" the Supreme Court remarked that objection to this instruction "seems hypercritical." We see no difference between the meaning of the word "important" and the word "weighty" when used in this connection. In Com. v. Baker, 93 Pa. Superior Ct. 360, the use of the words "weightier affairs of life" was not even criticised in an assignment complaining of the instruction on reasonable doubt. It seems clear that the more weighty or important the affair or question as to which action is to be taken the less substantial is the doubt required to cause hesitation as to it. Therefore, instruction that a doubt that would require an acquittal must be such as would cause hestitation in the weightier affairs of life gives effect to slighter doubt of guilt, and is more favorable to the accused, than instruction that the doubt must be one that would cause hesitation in coming to a decision in the ordinary affairs of life. Com. v. Cyaus, 88 Pa. Superior Ct. 227, relied on by appellant, does not decide that it was error to charge that the doubt must be one causing hesitation in a matter of *vital importance* to your personal affairs. We reversed because the instruction was that the doubt must be sufficient to impel one to *do* something in his personal affairs, that is, to act,

and not merely to pause, hesitate, and refrain from acting.

The second criticism of the portion of the charge defining reasonable doubt is that the jury were instructed that a reasonable doubt is one which arises in the *conscience* of the juror instead of in his *mind*. The complaint is so devoid of merit as to require little discussion. The clear effect of the instruction was that the defendants were entitled to the benefit of a doubt which troubled the conscience of the juror, as well as one which arose in his mind after consideration of the evidence. It is the mind of the juror, his intelligence, which must be convinced beyond a reasonable doubt: Com. v. Green, supra. The instruction that the mind of the juror must be so well satisfied of guilt that he can act with a clear conscience was favorable to defendants.

The third complaint of the instruction as to reasonable doubt is that the jury were told that the hesitation resulting from the doubt must be *substantial*. This complaint is hypercritical. "A doubt, to work an acquittal, must be serious and substantial": Com. v. Harman, 4 Pa. 269. Such a doubt arises from a real, that is, a substantial, and not a vague or captious hesitation.

The portion of the charge complained of under the twenty-ninth assignment of error requires no discussion, because the error asserted as to it is not fundamental and, therefore, not regularly before us. However, we find nothing in it which would warrant a reversal.

The thirty-first and thirty-second assignments of error complain of portions of the charge in which the learned trial judge discussed the effect of the testimony of Arigoni and Henshaw as relating to the question whether they were parties to the conspiracy charged. Granting, but not deciding, that the instruc-

tion was erroneous because it conveyed to the jury the idea that the mere passive acquiescence of Arigoni and Henshaw in the mayor's orders not to raid slot machines which they knew were in existence, was sufficient to prove that they were parties to the conspiracy, it does not follow that as to the defendants, Jermyn and Friend, it amounted to harmful error. Jermyn and Friend could have been convicted of conspiracy, even though Arigoni and Henshaw were not parties to it. The learned trial judge correctly defined conspiracy at the beginning of the charge; affirmed defendant's point defining conspiracy; and charged that Jermyn and Friend could be convicted if the proof established that they, or either of them, conspired with any other person named in the indictment. Further discussion is unnecessary.

Another complaint made of the charge is that it was error to fail to instruct the jury that Miller's testimony, that "Friend said that he kept one dollar and the balance went to City Hall. Pride said he gave all the money to the mayor," should not be considered as evidence against Jermyn unless they were satisfied from the other evidence in the case that he was a party to the conspiracy. When this evidence was offered by the district attorney the court said: "I will admit the evidence tentatively, but I will strike it out and instruct the jury to disregard it, unless you connect the defendant, Jermyn, with the conspiracy by evidence to be introduced later." Subsequently, the Commonwealth fulfilled its promise to the court to produce such evidence. This evidence, apart from the declarations, would have warranted appellant's conviction. Thus it appears that the court made it plain to the jury when the evidence was admitted that Friend's and Pride's declarations connecting Jermyn with the conspiracy would not become evidence against the latter until the admission of other evidence establishing that he was

a party to the criminal combination. Counsel for appellant made no request that the court instruct the jury in his charge that these declarations were not evidence against appellant unless the other evidence satisfied them that he was a party to the alleged conspiracy. No exception to the charge was taken on the ground that the court failed so to charge, and no such complaint was made upon the motion for a new trial. The question, therefore, is whether upon this record the failure so to charge amounts to such fundamental error as may be assigned under a general exception to the charge. We think not. After the Commonwealth produced the evidence, other than that of the declarations of the alleged co-conspirators, sufficient to establish that defendant was a party to the criminal combination, the evidence of such declarations, made during the performance of overt acts pursuant to the conspiracy and relating to the performance of the common design, became substantive evidence against Jermyn, for the consideration of the jury with the other evidence tending to establish his guilt. Of course, the jury could not be allowed to convict appellant upon the hearsay declarations of his alleged co-conspirators alone, which doubtless weighed heavily against him, but we find nothing in the record permitting us to conclude that this was done, nor that the jury could have understood that they could do it. To us it seems clear that the jury must have understood that the issue of appellant's guilt or innocence was to be determined upon all the evidence in the case. Our conclusion is that the failure of the court to charge specifically as to the weight or effect of these declarations as to Jermyn did not leave the jury without the requisite legal guide in a matter fundamental to the case.

The only remaining complaint to which specific reference need be made is that the charge as a whole

was erroneous, inadequate and prejudicial. Our reading of it has convinced us that the criticism is wholly unwarranted; that the case was submitted in an eminently fair manner. While the learned judge seems to have referred to every part of the testimony which tended to help defendants, he omitted to refer to several items of evidence which tended to establish their guilt. We get the impression from the charge that the court was at special pains to see that the jury received no suggestion as to his personal opinion as to the verdict which should be rendered upon the evidence. The contentions of appellant which we have not discussed are without merit.

All of the assignments of error are overruled.

The judgment is affirmed and it is ordered that the defendant, Edmund B. Jermyn, appear in the court below at such time as he may be there called, and that he be by that court committed until he has complied with the sentence, or any part of it, which had not been performed at the time the appeal in this case was made a supersedeas.

KELLER, J., dissents.

DISSENTING OPINION BY KELLER, J., December 27, 1930:

I am obliged to dissent from the opinion of the court.

Miller, the slot machine proprietor, who was the chief witness for the Commonwealth, gave no evidence directly connecting Jermyn with the conspiracy charged in the indictment. He testified that on the only occasion on which he approached Jermyn on the subject the latter told him "to get to hell out of here." He testified, however, as to declarations of Pride and Friend which were most damaging to Jermyn. These declarations were not admissible as evidence against Jermyn unless the jury first found, from the other

evidence in the case, that he was a co-conspirator with Friend and Pride. A conspiracy cannot be proved in the first instance by the declarations of an alleged co-conspirator. "Such declarations are not admissible until the parties affected thereby have been shown to be connected in some degree with the conspiracy charged": Com. v. Zuern, 16 Pa. Superior Ct. 588, 599; Com. v. Bingle, 62 Pa. Superior Ct. 105, 108.

Miller's evidence of his conversations with Pride and Friend was admissible for all purposes against Friend; the only question affecting the latter was whether the jury believed the testimony. But as to Jermyn the case was different. There was no evidence directly connecting him with the conspiracy. If he was a conspirator it had to be inferred from circumstances, and Miller's testimony of Pride's and Friend's declarations linking up Jermyn as a co-conspirator was not evidence for the purpose of proving him to be a conspirator, unless the conspiracy was established in the minds of the jury by evidence other than these hearsay declarations.

The order of proof was in the control of the court, but having admitted Miller's testimony of these declarations at a time when there was no competent evidence connecting Jermyn with the conspiracy, the court, in my opinion, should have charged the jury not to consider Miller's testimony of the declarations of Pride and Friend in passing on the guilt or innocence of Jermyn, unless they believed the other evidence in the case, wholly apart from Miller's, connecting Jermyn with the conspiracy.

I regard the omission, in the circumstances here present, as fundamental error. If it is error for a court to fail to warn or caution a jury not to convict on the uncorroborated evidence of an accomplice, (Com. v. Haines, 257 Pa. 289, 297; Cox v. Com., 125 Pa. 94, 103; Watson v. Com., 95 Pa. 418, 424; Com.

v. Craig, 19 Pa. Superior Ct. 81, 94), it should likewise be for failure to instruct a jury not to consider as evidence against one defendant hearsay declarations of an alleged co-conspirator, until they are first satisfied from the other evidence in the case that he was a conspirator with the persons making the declarations.

The appellant, Jermyn, could not move to strike out the evidence for it was admissible, if the jury were satisfied from the evidence, apart from the declarations, that he was a conspirator with Pride and Friend; but he was entitled, especially in view of the admission of the declarations in evidence before there was any proof of his connection with the conspiracy, to have the jury instructed and warned to disregard the evidence of these declarations as to him, unless they were convinced of the truth of the remaining evidence attempting to link him up with the conspiracy. I feel that in this case the jury were allowed to find Jermyn's guilt as a conspirator from the hearsay declarations of his alleged co-conspirators.

I would sustain the 35th assignment of error and grant a new trial.