Commonwealth *v.* Bruno et al., Appellants (No. 1).

Argued September 28, 1936. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Chas. E. Berger,* with him *Frank A. Bruno* and *J. F. Mahoney,* for appellants.

*Albert L. Thomas,* with him *James J. Gallagher* and *M. S. De Pierro,* for Commonwealth.

OPINION BY MR. JUSTICE DREW, November 23, 1936:

The village of Kelayres, in Kline Township, Schuylkill County, was the scene of a startling and tragic occurrence on the night of November 5, 1934, the eve of the general election of that year. Five unarmed men, peacefully occupied, so far as the record shows, were shot and killed on a principal street; and approximately twenty others, men, women and children, were wounded. As a result the appellants, Joseph J. Bruno, Philip Bruno, Alfred Bruno, James Bruno, Arthur Bruno and Anthony Orlando, all related by blood or marriage, were indicted jointly in five indictments for the murder of each decedent. Each appellant filed a petition for a severance, which was granted. Joseph J. Bruno alone took advantage of this.

Joseph J. Bruno was first tried for the killing of Frank Fiorelli, and convicted of manslaughter. He was next tried on three indictments, for the killing of Dominick Perna, John Galosky and Andrew Kostishiun, and convicted of murder in the second degree on each indict-

ment.   Later, all the appellants, except Joseph J. Bruno, were tried on four indictments, for the killing of Perna, Galosky, Kostishiun and Fiorelli, and Philip Bruno was convicted of manslaughter on each indictment, and the others were acquitted.

On September 9, 1935, the appellants were called for trial before the Honorable BENJAMIN R. JONES of the 11th Judicial District, specially presiding, on the indictment for the killing of William Forke, and Joseph J. Bruno and Philip Bruno were found guilty of murder of the first degree, and the penalty fixed at life imprisonment, and the other defendants were found guilty of murder of the second degree.   A motion for a new trial, assigning numerous reasons therefor was dismissed as to all the defendants except Paul Bruno, and as to him the motion was granted.   This resulted from a frank statement made to the court by the specially prosecuting attorney that, in his opinion, the conviction could not be sustained against Paul, to which the court agreed, with the suggestion that if the Commonwealth had no additional evidence against him a nol. pros. be entered.   This was done.

The court sentenced the defendants as follows:  Joseph and Philip Bruno to life imprisonment;  James and Alfred Bruno and Anthony Orlando each to serve not less than ten nor more than twenty years;  Arthur Bruno to serve not less than five nor more than ten years.   These appeals are from the judgments and sentences so imposed.

The background of the case, as disclosed by the record, is important.   For some years prior to November, 1934, there was political rivalry in Kline Township between the Bruno and McAloose factions for control of the various township offices.   At first it was a factional contest within the ranks of the Republican Party.   By November of 1933 the McAloose following became Democratic.   It was successful at the election of that year in winning political control of the township.   Legal pro-

ceedings resulted; there was an election contest and a resort to equity to suppress violent and coercive interference with the township schools *(Kline Twp. School District et al. v. McAloose et al.,* 317 Pa. 266). Finally, the eve of the election of 1934 arrived and at approximately the same time that evening each political party held a meeting. The Republican meeting, attended by these appellants, and many others, met in the rear of the home of Joseph J. Bruno, and was addressed by the said Bruno and others. It convened about 7:30 and adjourned about 8:30 o'clock. Joseph J. Bruno's residence, a brick structure, is located on the southwest corner of Fourth and Center Streets. The Democratic meeting was held at the extreme west end of Center Street and was attended by men, women and children.

After the Republican meeting had concluded, three automobiles proceeded to the place where the Democratic meeting was being held. One car, a Nash, belonging to Joseph J. Bruno, was driven by his daughter. Another car, a coupé, was being driven by Alfred Bruno, one of the appellants. A third car was driven by Paul Bruno. The cars proceeded about the town and as they neared the meeting of the Democrats, and at a point close to the meeting, Alfred Bruno stopped his car, got out and fired several shots. A great many children followed the cars booing and hissing and some stones were thrown. An occupant of one of the cars testified that the purpose of driving to this meeting was to ascertain whether it had adjourned.

While the Democratic meeting was in progress, cheering could be heard where the Republicans were gathered. At that place about 8 P. M., Joseph J. Bruno and Philip Bruno were seen standing in the doorway of Republican Headquarters, and Philip was heard to say to Joe "Listen to them holler," and Joe replied, in substance, "Let them holler. They will have to pass here, and we'll get them one by one." This was the testimony of four witnesses called by the Commonwealth. Two of them, De-

Maria and Dragonet, said that Philip nodded and entered Joe's home. Another, Fiorelli, said that Philip simply looked at him. The fourth, Sabatelle, said that Philip made no reply.

At the conclusion of the Democratic meeting a parade was organized, which was led by a boy carrying an American flag, he being followed by men, women and children to the number of about four hundred. A line of automobiles brought up the rear. The parade proceeded in formation along Center Street to the corner of Fourth Street, where it was halted for a while because of some confusion as to the direction it should take; the boy with the flag first turned north on Fourth Street and was followed by a number of the paraders. After proceeding in that direction a short distance, he turned and proceeded in the opposite direction, south on Fourth Street. At this street intersection at that time there were probably 600 or 800 people, some in the parade, others standing in the street, and still others on the sidewalks.

The record shows that as the parade was passing south on Fourth Street, James Bruno, one of the appellants, ran north on Fourth Street, jumped upon the lawn between the Joseph J. Bruno home and his own and after shouting to the crowd, drew a pistol and fired four or five shots. He then retreated to the rear of the lot and entered the home of his father, Joseph J. Bruno, by a side door. At about the same time Arthur Bruno and Anthony Orlando, other appellants, were seen standing at the corner of Fourth and Center Streets, and Orlando was seen to move over near the front porch of the Joseph J. Bruno house where he crouched and fired several shots from a pistol. After this occurrence Orlando and Arthur Bruno went west on Center Street, Arthur Bruno going into the home of Joseph J. Bruno and Orlando to a point further down on Center Street. The shooting scattered the paraders in all directions. Exploded cartridges were later found on the lawn where James Bruno was standing and other cartridges were found where Or-

lando was seen to have been shooting. At the same time, while the paraders were passing the Center Street side of the Bruno house, Joseph J. Bruno was seen at an upstairs window with a gun in his hand, the window was up a short distance and the barrel of the gun was protruding. Philip Bruno was standing beside him. Mary Rush testified that she was in the parade, that there was shooting from the upstairs window of Joseph Bruno's home, that she saw Joe Bruno at the Center Street window shooting, and that there was another man at his side. The other man was identified as Philip.

It was shown that immediately after the shooting on the lawn by James Bruno and near the porch by Orlando, that shooting began from the upstairs windows on the Center Street and Fourth Street sides of the Bruno house. It was testified that it was intermittent and that about a hundred shots in all were fired. The shooting was described as being like "machine gun firing," "coming like rain," "in rapid succession." When it began the people in the streets ran in all directions, some of them north on Fourth Street to the home of Daniel McAloose. The firing from the Bruno home was across the intersection of Center and Fourth Streets, and toward the McAloose home, a few doors north of Center Street. Frank Fiorelli, an old man, not a participant in the parade, who stood at the intersection of the two streets, was shot and killed. While he was lying on the ground John Galosky attempted to go to his rescue and he was shot and killed, and his body was found close to that of Fiorelli. Dominick Perna, while standing next to a telegraph pole at the intersection of the two streets, was shot and killed. His body was found at the pole and about six or eight feet from the bodies of Fiorelli and Galosky. Andrew Kostishiun ran across Fourth Street to go to the aid of the men above-mentioned and he was shot and killed and his body was found near the bodies of Fiorelli and Galosky. Many witnesses testified that at the time these men were killed shooting was coming

from the windows of the Bruno house. After the firing had apparently subsided William Forke, accompanied by his wife, and Charles Grego and his wife, were proceeding towards Fourth Street on Center Street and as they reached the intersection Forke was shot and killed. About twenty people were injured, most of them in the back of the body, as they were fleeing from the Bruno house toward the McAloose home, where many took refuge. BB shot penetrated the walls of the front room of the McAloose home which was in the direct line of fire from the Bruno house.

The men who lost their lives, with the exception of Forke, were killed by BB shot, a great quantity of which was found in the Bruno house immediately after the happening, some of it in loaded guns in the Center Street bedroom of that house. Those who were injured were wounded by BB shot. William Forke died as a result of a bullet wound. The record shows that the shot entered the abdomen and came out of the back and that the point of exit was four inches below the point of entrance. The Commonwealth contended that the course downward of this bullet proved that the shot was fired from an elevation, which it insisted was the upstairs window of the Bruno house.

Just before the parade reached the Bruno home, one of the appellants, Alfred Bruno, came to a window and looked in the direction from which the parade was approaching, and immediately disappeared. Almost at once all lights in the house were extinguished with the exception of one in the kitchen.

The constable of the township was present during the occurrence and summoned the state police. When they arrived they went to the Bruno house and found Joseph J. Bruno, Philip Bruno, Arthur Bruno, James Bruno, all appellants, and others. They searched the premises and in the Center Street bedroom—the room occupied by Joseph J. Bruno—they discovered two double-barrelled Parker shotguns loaded with BB shot lying across the

bed, each of which gave evidence of recent discharge. Also on the bed was a pail containing forty or fifty loaded BB shells. Another shotgun and two rifles were found in the room, one loaded with ten and the other with five cartridges. The officers also observed a powder burn mark on the outside ledge of the Center Street window from which shooting had come. A revolver containing six cartridges and a belt containing twelve cartridges were taken from the person of Philip Bruno. A high-powered semi-automatic Winchester rifle in the closet of the Fourth Street bedroom gave evidence of having been recently fired. A clip, fitting this gun, together with some unexploded cartridges, was discovered between the mattress and the spring of the bed in the room, and nine exploded cartridges that fitted this rifle were found under the rug. There were also several revolvers and a rifle, all loaded, in this room. A screen in the window contained a hole large enough to accommodate the barrel of a rifle and directly opposite this hole there was a break in the glass of the window. On the porch roof just outside this window there were two exploded cartridges of the same calibre used in the high-powered rifle found in the closet of the room. There was a small hole in the plaster just above the bed in this room and when the plaster was removed, a bullet was lying on the beam behind it. This bullet was compared with other bullets discharged from a Spanish .25-calibre automatic pistol found in a back bedroom dresser. On the basis of this comparison, a qualified firearms expert testified that the bullet behind the plaster was discharged from this pistol.

The high-powered Winchester rifle was purchased by Joseph J. Bruno in Hazleton nine days before this occurrence. At the time the order was given, there was an extra clip holding ten cartridges ordered, this in addition to the one containing five cartridges supplied with the gun. There was also purchased at that time 100 cartridges suitable for use in this rifle.

The defense was a general denial. The appellants denied everything which could be held against them in a very wholesale way. As an illustration of this we need cite only that they all denied that there was any gunshot firing from within the Bruno house. Although five men were shot down immediately before the house and many others were wounded and, although no one was injured inside the house or the house itself damaged by gunshot fire, they all insisted that the firing was from without the house and directed against it for the purpose of injuring Joseph J. Bruno. They contended that the alleged parade was a mob, which approached the Bruno house carrying clubs and stones, shouting and calling for Joe Bruno, inviting him out and voicing threats of "Down with Bruno"; some crying "We'll lynch him to-night." Although there was much of this kind of testimony given for the defense, it should be noted that not a witness gave the name of a single individual who carried a club or threw a stone. If all the firing had been at the house the building itself certainly would have shown some evidence of it. The defense did not give the location of a single bullet hole other than the one in the bedroom. And, according to the testimony of a state trooper, who qualified as an expert on the subject of firearms, that bullet was fired from the Spanish revolver found in the Bruno house the evening of the shooting. Two bullet holes, one in the neighborhood of the dormer window and the other in the roof, were found. These holes were on a line and possibly were made by a single shot, which could have come from the weapon discharged by James Bruno or Anthony Orlando. These three bullet holes were the only evidence of shots in the Bruno dwelling. The Commonwealth claimed that with all the shooting that night, if the firing was against the Bruno house, it would bear many marks and much evidence of damage done by gunshot fire.

The overwhelming weight of the vital testimony favored the Commonwealth and that appellants were con-

victed can occasion no surprise. A concert of action between them was shown so that each was responsible, not only for his own acts, but also for those of the others. The testimony linked each appellant to the completed act and each was as responsible for the whole as if he had been the sole perpetrator. The essential facts of this case, which prove guilt, have been passed upon in several trials with the same result, the conviction of the accused as indicted.

Counsel have diligently and astutely fine-combed this large record to the end that they might find ground for a new trial. Their efforts have been in vain. After a very careful consideration of their brief of almost 300 pages, and the record as a whole, we find only a few assignments of error worthy of consideration. It should be said in passing that this case was tried by an able and learned judge, of long experience in the judiciary, with such care and concern for the rights of all involved that his work could hardly have been surpassed. His rulings and his charge were eminently fair.

The first assignment complains of certain language used by the trial judge in his charge on the subject of reasonable doubt. It is as follows: "It does not mean a trivial doubt nor a doubt about a trivial incident in the case." The charge very fully informed the jury of the law of reasonable doubt, not only by way of definition and illustration, but also by actual application of the law itself to the facts of the case. It would seem to have been impossible for the jury after hearing the evidence and the oral charge, to have misunderstood their duty to determine the case on the evidence, giving to the accused the benefit of any substantial doubt arising out of it.

The language objected to has already been passed upon by this court with approval. We have said, speaking through Mr. Chief Justice GIBSON, in *Commonwealth v. Harman*, 4 Pa. 269, at page 274, that "a doubt, to work an acquittal, must be serious and substantial—not the mere possibility of a doubt"; and in the celebrated case

of *Commonwealth v. Drum,* 58 Pa. 9, it was said, at page 22, by Mr. Justice AGNEW that: "It must be an honest doubt—such a difficulty as fairly strikes a conscientious mind and clouds the judgment." And in *Commonwealth v. Green,* 292 Pa. 579, at page 590, by Mr. Chief Justice MOSCHZISKER, we said the doubt must be on a point "essential to the Commonwealth's case." If a doubt must be substantial it goes without saying that it cannot be trivial. A trivial doubt would be one of no consequence and, therefore, not essential; in fact it might be said that in the decision of a serious matter the use of such a doubt to determine it would be little less than an excuse to avoid an unpleasant duty, in which event it would be neither substantial nor honest. The expression is unobjectionable.

It is claimed the court erred in expressing the following thought: "You are not at liberty to disbelieve as jurors if from the evidence you believe as men and women. Your oath imposes on you no obligation to doubt where no doubt would exist if no oath had been administered." In *Fife v. Commonwealth,* 29 Pa. 429, we held that such instruction was not erroneous in point of law. We there said, at pages 438-9: "It is made matter of complaint that the judge, in his charge, among other remarks, said that 'he who is to pass on the question (of guilt or innocence) is not at liberty to disbelieve as a *juror* while he believes as a *man.'* . . . Jurors are *men.* . . . The term 'jurors' means nothing more than *twelve men* qualified and sworn to try a cause according to the evidence. . . . Nothing more is demanded of them as jurors than an honest exercise of their judgment as men. . . . Their belief is the same in both." The mention by the trial judge of the identity of belief as men and as jurors is substantially a quotation sanctioned by the decisions in *Commonwealth v. Harman,* supra; *Fife v. Commonwealth,* supra; *McMeen v. Commonwealth,* 114 Pa. 300, 305; *Clark v. Commonwealth,* 123 Pa. 555, 575. In the latter case

practically the same language was used by the trial judge as that objected to here. The exception is of no moment.

Another assignment objects to the charge on self-defense. The trial judge affirmed and read defendants' point. He also elaborated upon the right to repel with necessary force the invasion of the home and attacks upon the person and family of the accused. Attention was called to the element of reasonably apparent necessity. The evidence to prove it was fully reviewed and the fact that appellants denied causing the death of any of the victims was included. The charge in this respect was full and fair.

A further assignment alleges that the trial court erred in that after the exhaustion of the regular panel of jurors it directed a venire to two elisors, commanding them to summon talesmen. In the order of the Supreme Court assigning Judge JONES to try this case we directed him to take that action, in case he found it necessary, as authorized by the Act of April 14, 1834, P. L. 333. Of a truth he had such authority without our order because section 144 of that Act provides that when ". . . there shall not be a sufficient number of jurors present, competent for the trial of any cause which shall be called for trial, the sheriff or coroner, or if the case require it two citizens to be appointed by the court for that purpose, shall . . . immediately summon . . . so many qualified and competent persons as shall be necessary to fill up the jury for the trial of such cause." The action taken was entirely within the sound discretion of the trial judge, and under the extraordinary circumstances in which this trial was had it cannot be said that there was an abuse of that discretion. The trial court thought, and this court felt when it issued its order, that the political officers of the county, the sheriff and the coroner, might wish to be or should be relieved of the duty of drawing talesmen in the trial of this particular case. Under the circumstances, the trial court exercised a

sound and wise discretion in calling upon two elisors, under the authority of the statute, to summon the needed talesmen.

Appellants further contend that since Paul Bruno was granted a new trial like relief must be extended to them. The reason offered is that one of the theories on which the case was tried was that the killings occurred in the execution of a conspiracy to do violence, and that all indicted must stand or fall together. To support the contention they cite *Regina v. Gompertz*, 58 E. C. L. 823 (1846), and *Commonwealth v. McGowan*, 2 Parsons, Select Equity Cases, 341, 348, 364 (Phila. O. & T. 1848), both of which broadly hold that a new trial may never be granted only to one indicted with others for conspiracy. Under some circumstances we should reach the same result as do those cases, but the rule as they state it requires qualification. A new trial to one conspirator need not necessarily entail a new trial for all: *Dufour v. U. S.*, 39 Wash. L. R. 714 (D. C. Ct. App.); *Browne v. U. S.*, 145 Fed. 1; see note 25 Harv. L. Rev. 288. Evidence to connect one with the combination may be lacking, as it is here as to Paul. It is a question in each case whether separate treatment of one defendant in any way prejudices the others. There is no prejudice here. *Commonwealth v. Faulknier*, 89 Pa. Superior Ct. 454, cited by appellants, is not out of harmony with the conclusion we reach. It holds only that in a conspiracy case at least two defendants must be convicted. The reference to the broad language of *Commonwealth v. Mc-Gowan*, supra, was not needed. We are aided to our conclusion by an analogy. Surely the court is as competent to review the evidence and find it insufficient as is the jury; and an acquittal of one alleged conspirator does not release all *(Commonwealth v. Edwards*, 135 Pa. 474, 478; *Commonwealth v. Valverdi*, 218 Pa. 7, 11), unless, of course, only one remains under conviction: *Rex v. Plummer* [1902], 2 K. B. 339; cf. *Commonwealth v. Faulknier*, supra.

Also assigned as error is the charge as to the effect to be given evidence regarding purchase of the rifle by Joseph J. Bruno nine days before the shooting. William Forke was slain by a bullet which on the evidence the jury could have found came from this gun. The evidence was clearly admissible for the purpose of showing preparation and ownership.

We have examined the other assignments but find no merit in them. It does not appear that appellants were prejudiced by anything alleged in these assignments to have been said or done. It would encumber this opinion too much and to no useful purpose to take them up and dispose of them seriatim.

We have made a very careful examination of this voluminous record. We have not found a single instance, in the evidence or charge of the court, to justify any complaint by the appellants. The case was well tried, appellants were represented by able counsel, and the verdict was only what any reasonable person could expect. It would be difficult to understand how a jury bound by its oath could have made any other return. And considering the enormity of the offense of the accused, it is evident the jury tempered justice with mercy when it fixed the penalty for first degree murder at life imprisonment for the principal offenders.

The assignments of error are all overruled, the judgments and sentences of the court below are affirmed and the record is remitted for execution in accordance therewith.