# Commonwealth *v.* Green, Appellant.

*Criminal law—Murder—Evidence—Offers—Reasons—Exhibit— ,Waiver of objection—Dying declaration in writing—Subscribing witnesses—Charge.*

1. On the trial of an indictment for murder where there is evidence that the deceased, in contemplation of death, stated verbally, and subsequently put her mark on a written statement witnessed by a notary and another person, that defendant had shot her "after they had got arguing over another woman," such statement is admissible in evidence without the identification of the document by the notary, or the other subscribing witness, if one who was present at the time the statement was executed, is called and identifies it.

2. And especially is it proper to admit such statement where it appears that, after the formal offer of it was made but before it was shown to the jury, counsel for defendant, during the cross-examination of the witness for the Commonwealth who produced the writing, had the witness read the writing to the jury; and where it also appears that the only objection of record was simply that the notary public was not in court to testify.

*Criminal law—Murder—Degree—Charge—Appeals.*

3. In a homicide case, the trial judge must tell the jury what the relevant law is, in reference to the degree, and he is at liberty to say what, if the jury finds the facts a certain way, the verdict ought to be, but he cannot say what the verdict must be.

4. Where the Commonwealth does not ask a conviction of first degree murder and there is no evidence of manslaughter, even in such a case the judge should not charge that the verdict "must be either a conviction in the second degree or acquittal"; but where such an error is made, the appellate court will not send the case back for a new trial simply to give the jury an opportunity to do what, in fact, it ought not to do.

*Criminal law—Murder—Reasonable doubt—Charge.*

5. Over-elaboration of the definition of reasonable doubt often leads to refinements which tend to confuse rather than help the jury to a correct understanding of the doctrine.

6. What the law terms a reasonable doubt may warrantably arise in the mind of the jury at any stage of their consideration of the evidence; and it can arise either out of a particular item of evidence or out of the evidence as a whole.

7. Although the trial judge first correctly charges that a reasonable doubt may arise from the entire evidence, yet he commits reversible error if he restricts such instructions by further charging that such doubt can arise "only" from "weaknesses," "lapses," and "unexplained portions" of the evidence, or says that the doubt to which he referred was one which arises "because of some pieces of evidence that do not hold together, are not strong enough."

8. If, in an endeavor to determine from the evidence any point essential to the Commonwealth's case, the juror hesitates as between two conclusions and finds himself thinking, as to one of them, "Such is, or may be, the facts," and then is mentally reluctant to so conclude, and, after considering the evidence from all angles, such hesitancy still persists, that is what the law terms a reasonable doubt, and defendant is entitled to the benefit of it.

9. The doubt may arise out of the evidence on an isolated point, essential to the Commonwealth's case, or out of the whole

body of the evidence. The juror should be warned, however, that the reluctance to reach a conclusion, which he is to heed, is not one caused by sympathy or compassion for the defendant or others who may be affected by a verdict against him; that it must not be a doubt which comes out of the juror's heart, but one which arises in his mind after consideration of the evidence; that he is not at any time, in his deliberations on the case, to allow himself to conjure up a doubt in order to avoid the performance of a disagreeable duty, or to be controlled by a hesitancy over the decision of a point which he would not consider a matter of doubt or hesitate to decide if it arose in an affair of importance to himself.

10. On the other hand, the juror should be warned that he ought not to condemn unless he is so convinced by the evidence that he would venture to act upon that conviction in matters of concern and importance to his own interest.

11. While the trial judge is privileged to review the evidence and express an opinion thereon, yet the main purpose of a charge is to state and explain the law, not to carry on a process of general reasoning which tends to influence the jury in either direction.

Argued March 12, 1928. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

Appeal, No. 149, Jan. T., 1928, by defendant, from judgment of O. & T. Phila. Co., Aug. T., 1927, No. 60, on verdict of guilty, in case of Commonwealth v. Addis Green. Reversed.

Indictment for murder. Before KUN, J.

The opinion of the Supreme Court states the facts.

Verdict, guilty of murder of the second degree, on which sentence was passed. Defendant appealed.

*Errors assigned* were various rulings and instructions, quoting record.

*Harry Shapiro,* for appellant.—A dying declaration bearing the mark of the deceased is not admissible in evidence without proof of its execution by either of the the two subscribing witnesses: Truby v. Byers, 6 Pa. 347; North Penn Iron Co. v. Lithord Co., 217 Pa. 538.

In a homicide case it is the duty of the trial judge to charge as to the various degrees of murder and manslaughter: Com. v. Marcinko, 242 Pa. 388.

The charge of the court was erroneous as to what is meant by "reasonable doubt": Com. v. Devine, 18 Pa. Superior Ct. 431; Com. v. Bober, 59 Pa. Superior Ct. 573; Com. v. Rider, 29 Pa. Superior Ct. 621; Com. v. Hoskins, 60 Pa. Superior Ct. 230; Com. v. Andrews, 234 Pa. 597; Com. v. Colandro, 231 Pa. 343.

*Charles C. Gordon,* Assistant District Attorney, with him *John Monaghan,* District Attorney, for appellee.

OPINION BY MR. CHIEF JUSTICE MOSCHZISKER, April 16, 1928:

Addis Green was indicted for the murder of Adelphia Pinn, who was found at 618 South Clifton Street, Philadelphia, early in the morning of June 20, 1927, with a bullet wound in her abdomen, which nine days later proved fatal. Defendant appeals from a sentence of not less than six nor more than twelve years in the county prison, following a verdict of second degree murder.

A witness for the Commonwealth testified to having heard a man, whom he identified as the defendant, and a woman, whom he could not identify, talking in rather loud tones outside his room, on the second floor of the Clifton Street house. A short time afterward he heard a shot, and, still later, went downstairs, where deceased lay prostrate, surrounded by police officers. A witness for the accused, who lived next door to the premises where the homicide occurred, also said that, on the evening in question, he heard some "squabbling" in his neighbor's house, followed by the sound of a shot; then he saw a man, not the defendant, leaving No. 618, with a pistol in his hand.

The Commonwealth's case rested chiefly on a dying declaration alleged to have been made by Adelphia Pinn

at the hospital where she was taken after the shooting. There, according to the testimony for the prosecution, the wounded woman stated verbally, and subsequently put her mark on a written statement, that defendant had shot her after they had "got to arguing over [another] woman." These statements were testified to by one Anderson, a detective, who arrested defendant. Anderson said that the statements were made in his presence and in that of defendant; also that Green had not at the time denied the assertions of the deceased; further, that the written dying declaration was dictated by her, taken down by the witness, certified by the notary and witnessed by another police officer, one Anthony Gentila, who subscribed his name thereto. The notary public did not take the stand; the police officer in question was called as a witness for the Commonwealth, but was not interrogated by either side concerning the dying declaration.

Defendant testified that, on the evening of the homicide, he and Adelphia Pinn had spent some time together, drinking; that, later in the evening, a man called, who, without apparent provocation, "spoke a nasty word," and hit him; whereupon he, Green, left the house, and a few minutes later heard the report of a revolver and a scream. Green said he then went to his uncle's home, and sent a messenger to his own house for a raincoat; while waiting for it, he was apprehended by detective Anderson, who took him to the hospital to be identified. Defendant further testified that he there said to the injured woman, "Adelphia, tell the truth. Do you mean to tell the man I shot you?" but she did not answer. He admitted that when Anderson asked her whether he, Green, was the man who wounded her, she nodded her head in the affirmative, and that he himself said nothing in reply. Defendant denied that any statement, in the form of a dying declaration, or otherwise, was written while he was at the hospital.

The question of the validity of the admission of the written statement alleged to have been made by the deceased, which was offered in evidence by the Commonwealth, and accepted by the court below as a dying declaration, is raised by appellant; this will be the first point of law considered by us.

Anderson, the officer who arrested defendant, testified for the Commonwealth that he took Green to the hospital where his victim was lodged, and the latter said, in the presence of the prisoner, "That is the man that shot me, Addis Green." The witness testified further, that the wounded woman declared, "Addis Green came to 618 South Clifton Street with another woman, that she had some words about this woman with Addis Green......and that is why he shot her." Anderson said also that, after these oral statements and while the defendant was "standing there," a notary public came into the room; that the doctor in charge of deceased told her she would die, and the deceased replied, "I know I am going to die"; that, "then she made a statement in the presence of the defendant," which was written down by the witness and signed by the deceased with her "cross" mark. When this written statement was offered in evidence, counsel for defendant entered the following objection: "I object to the statement until the notary public is here to testify." The statement was made not only in the presence of the notary public, who certified it, but also in that of Anthony Gentila, who subscribed his name as a witness; and now counsel for defendant contends that the statement, being in writing and subscribed to by the notary and witnessed by Gentila, should not have been accepted in evidence until both of these subscribing witnesses had taken the stand and identified the document. While it is proper practice, where a dying declaration is offered in evidence in a murder case, to place upon the stand all those who were present at the time the declaration was made,

whether subscribing witnesses or not, yet there is no rule of law which requires this to be done. Failure to follow the course indicated could not be accounted reversible error in a case like the present, where the written declaration coincides with, and does not in any material degree supplement, previous oral statements made by deceased, which were testified to, without objection on the part of defendant, before the offer of the writing; where, also, the record shows that, after the formal offer of the written declaration, but before it was shown to the jury, counsel for defendant, during the cross-examination of the witness for the Commonwealth who produced the writing, had the witness read the document to the jury; and, finally, where the point made by counsel for defendant, at the time of the objections to the offer of the written dying declaration, was not that all those present at the signing of the writing should be called to the stand, or even that the subscribing witnesses had to be called to identify the writing, but was simply that the notary public who officially certified to the document was not in court to testify. Under the circumstances of this case, we are not convinced of reversible error in connection with the acceptance in evidence of the written dying declaration; though, before passing from the subject in hand, we take occasion to note that, since the fact that such a declaration had been made was at least impliedly denied by defendant, it would have been better had the trial judge, when instructing the jury, not assumed the existence of the declaration, as he repeatedly did in the course of his charge.

To take up another matter of complaint, at the beginning of the charge the trial judge said to the jury: "The district attorney is not pressing for first degree murder......but for second degree......If, after all the evidence has been considered, you are satisfied beyond a reasonable doubt that the defendant......shot

the deceased, he should under the circumstances be found guilty of second degree murder; there are, in other words, no elements in the case......which would reduce the degree of crime. The verdict must be either second degree murder or acquittal." Near the end of the charge, the judge again said: "If you convict him, you must convict of murder in the second degree; because there are no elements in the case which would reduce the grade of the offense. It must either be a conviction in the second degree or acquittal." The learned judge was quite right in his view that the evidence in the case was not such as to warrant a finding of manslaughter. As previously stated, there was some testimony, by a witness for the Commonwealth, who lived in the house where the homicide occurred, to the effect that, about twenty minutes before the shooting, he heard "loud talk." This witness said that what he heard was "a kind of little fuss," indicating a "disagreement" between one who, from the tones of his voice, the witness thought was the defendant, and a woman; he stated the talk was "not loud so as to disturb anybody." Afterwards he referred to the loud talk as "a fuss or quarrel," but he minimized this by saying there was "nothing about the manner of the talk that concerned" him. Defendant, as a witness for himself, stated that, on the evening in question, he had had no quarrel with the deceased; that his relations with her were "friendly." The witness for defendant who lived next door to the house where the homicide occurred, testified that a few minutes before the pistol shot, he had heard "somebody squabbling" in his neighbor's house. This is all the testimony on the subject of what, at times, in the course of the trial, was designated as the "quarrel" between defendant and the deceased; and it is entirely insufficient to reduce the grade of the homicide from second degree murder to manslaughter. Under these circumstances, had the trial judge said nothing

about manslaughter, his charge would not properly be subject to criticism because of the omission (Com. v. Newson, 277 Pa. 48, 52), or, again, had he ended the parts of his charge which we are now examining with the simple statement that, if the jury were "satisfied beyond a reasonable doubt the defendant......shot the deceased, he should, under the circumstances, be found guilty of second degree murder," because there was no evidence in the case, as presented, "which would reduce the degree of the crime," appellant could have made no proper complaint,—for, while expressing an opinion, such an instruction would have left the jury free to fix the grade of the homicide; but the learned judge went too far by instructing that the verdict "must be either a conviction in the second degree or acquittal." In a homicide case, the trial judge must tell the jury what the relevant law is, and he is at liberty to say what, if the jury finds the facts a certain way, the verdict ought to be; he cannot, however, say to the jury what the verdict must be. Here, the judge overstepped the bounds, when, in the above quoted instruction, he used the imperative word "must." Though, technically, the law is as just stated, yet, since, on the evidence before us, a finding of manslaughter would be a plain abuse of the power of the jury, if the instructions under discussion constituted the only error in the record, we would not send the case back for a new trial simply to give the jury an opportunity to do what it ought not to do; but other instructions appear in the charge which require a reversal of the judgment entered by the court below.

After telling the jurors that, before they could convict defendant, they would have to be satisfied of his guilt beyond a reasonable doubt, and that if, after considering all the evidence, they were so satisfied, they should find accordingly, the trial judge said: "A reasonable doubt can *only* arise from the evidence presented

where there are weaknesses, lapses, unexplained portions of the evidence that leave you with a sort of hesitancy and doubt......If you are satisfied from the consideration of the entire evidence in the case, both of the Commonwealth and the defendant, that this man committed this deed......and if, *after your conviction is formed,* there is no hesitancy, no reasonable doubt in your minds, and the whole evidence points to his guilt beyond a reasonable doubt, *as I have explained it to you,* then your duty is to convict him......If, after consideration of all the evidence and talking it over, you are not satisfied beyond a reasonable doubt, there is hesitancy on your part,—and I don't say that you have to be sure,—but if there is a hesitancy on your part to form the final conclusion and a doubt arises in your minds *because of some pieces of evidence,* that they do not hold together, are not strong enough, *if such a reasonable doubt as that* exists, defendant is entitled to the benefit of it, and you must give it to him and acquit him." (All of the italics are ours.)

The above excerpts give in substance the instructions on reasonable doubt, though the charge mentions that doctrine many other times. Over-elaboration of the definition of reasonable doubt often leads to refinements which tend to confuse rather than help the jury to a correct understanding of the doctrine. Here the trial judge, in his anxiety to help the jury, made the mistake, which many another judge has fallen into before, of over-elaborating the whole subject of reasonable doubt.

What the law terms a reasonable doubt may warrantably arise in the mind of the jury at any stage of their consideration of the evidence; not necessarily after the jury's "conviction is formed," as stated to the jury in this case, and it can arise either out of a particular item of evidence, or out of the evidence as a whole. While the trial judge told the jury that they must be satisfied after consideration of "the entire evidence in

the case," and referred to "all the evidence," yet whenever he spoke to the jury of "all the evidence," or of the "entire evidence," he coupled with these expressions instructions that a reasonable doubt can arise "only" from "weaknesses," "lapses," and "unexplained portions" of the evidence, or said that the doubt to which he referred was one that arose "because of some pieces of evidence that do not hold together, are not strong enough," and told the jury that "if *such* a reasonable doubt *as that* exists" (the italics are ours), the defendant was entitled to the benefit of it; thus destroying the effect of his statement that the doubt might arise out of the entire body of the evidence. Still, again, after telling the jurors that, before they could convict they must be satisfied that the whole evidence pointed to guilt beyond a reasonable doubt, the trial judge immediately added, "as I have explained it to you"; and when we look at the explanation to which he refers, we find it is wrong, for, as just said, it specifically states that the kind of doubt which would entitle defendant to an acquittal "can only arise" from "weaknesses," "lapses," and "unexplained portions of the evidence" or "because of some pieces of evidence that do not hold together, are not strong enough." We have said many times that if from any or from all the evidence taken together, a reasonable doubt of the defendant's guilt is raised, there should be an acquittal (see for instance Tiffany v. Commonwealth, 121 Pa. 165, 180); the doubt may arise from the whole body of the evidence without regard to, or in the absence of, such elements as those mentioned by the trial judge in the present case, and the defendant was entitled as a matter of law to have the jury so informed. The law does not require the juror, after considering all the evidence, to put his mind's eye on some particular item of proof or on some particular defect in the evidence, as being that which creates a doubt in his mind concerning the existence

of a fact essential to the Commonwealth's case, before he can give the benefit of such a doubt to the defendant, though here the trial judge practically so instructed. The minute explanations of reasonable doubt in the present case are harmfully misleading,—correct statements in the charge are constantly explained away by those which are clearly incorrect. The assignments of error which complain of the instructions we have been discussing must be sustained.

Before parting from the subject of reasonable doubt, we may say that, though in the past much has been written on the point, yet numerous appeals recently before us show it to be a matter which still troubles the profession; therefore, in the hope of aiding the trial of this and future criminal cases, we take occasion to state that the doctrine of reasonable doubt is as follows: If, in an endeavor to determine from the evidence any point essential to the Commonwealth's case, the juror hesitates as between two conclusions and finds himself thinking, as to one of them, "Such is, or may be, the fact," and then is mentally reluctant to so conclude, and, after considering the evidence from all angles, such hesitancy still persists, that is what the law terms a reasonable doubt, and the defendant is entitled to the benefit of it. In other words, when the juror is in the mental condition just described, he is bound to draw inferences and find facts whichever way is most favorable to the defendant; and this is equally so whether the point of doubt concerns a prime fact in the case, or only a minor matter necessary to consider on the way to determine a prime fact, or whether it has to do with the juror's ultimate conclusion on the question of the guilt of the defendant. The doubt may arise out of the evidence on an isolated point, essential to the Commonwealth's case, or out of the whole body of the evidence. The juror should be warned, however, that the reluctance to reach a conclusion, which he is to

heed, is not one caused by sympathy or compassion for the defendant or others who may be affected by a verdict against him; that it must not be a doubt which comes out of the juror's heart, but one which arises in his mind after consideration of the evidence; that he is not at any time, in his deliberations on the case, to allow himself to conjure up a doubt in order to avoid the performance of a disagreeable duty or to be controlled by a hesitancy over the decision of a point which he would not consider a matter of doubt or hesitate to decide if it arose in an affair of importance to himself. On the other hand, the juror should be warned that he "ought not to condemn unless he is so convinced by the evidence that he would venture to act upon that conviction in matters of......importance to his own interest": Com. v. Andrews, 234 Pa. 597, 608. Such a charge, appropriately phrased for application to the particular contentions of fact before the court, would cover most cases requiring instructions on the doctrine of reasonable doubt.

By other assignments, appellant complains, to quote from the brief of his counsel, that the charge "misquoted important testimony, minimized the value and the inferences to be drawn from defendant's testimony, and emphasized unduly the Commonwealth's testimony." While unable to agree with this wholesale criticism, or to find cause for reversal in any of the specified errors claimed in these assignments, we cannot say that appellant has no warrant for complaint. It is always the privilege and often the duty of a trial judge to review the evidence, and he may express an opinion thereon (Com. v. Elliott, 292 Pa. 16, 21) or even suggest what he considers its points of strength and weakness, so long as he plainly leaves to the jury the decision of facts and inferences to be drawn therefrom; but, as said by our Superior Court in Commonwealth v. Meads (29 Pa. Superior Ct. 321, 330): The main "purpose

of a charge is to state and explain the law, not to carry on a process of general reasoning which tends to influence the jury in either direction." Many parts of the present charge are justly subject to the criticism of containing an over-abundance of argument, or reasoning, which might better have been left to counsel in the case, and this should be avoided at the next trial.

The judgment is reversed and a new trial granted.