166 Pa. Superior Ct. 577 (1950)
Commonwealth
v.
Statti, Appellant.
Superior Court of Pennsylvania.
Argued March 13, 1950.
May 20, 1950.
*578 Before RHODES, P.J., HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ.
James M. Keller, for appellant.
Leroy K. Donaldson, Assistant District Attorney, with him Sherman K. Levine, District Attorney, for appellee.
OPINION BY HIRT, J., May 20, 1950:
This is an appeal from the judgment of sentence imposed upon the defendant, following his conviction of assault and battery with intent to commit rape. He seeks a new trial notwithstanding, under the evidence, the jury well might have convicted him of common law rape charged in the first count of the indictment.
*579 Hope Ann Savicky lived with her husband on Jamison Avenue in the Borough of Ellport. On her way home alone in her automobile about four o'clock in the morning of April 30, 1949, she noted that a man in an automobile was following her. There was but one headlight on his car. When she drove into the driveway of her home he followed her and when she was about to alight he placed a hand over her mouth and with threats to kill her dragged her into his car. He then drove to a lonely church yard and there raped her, according to her testimony. In the struggle, while being forced from one car to the other she bit the middle finger of the left hand of her assailant causing it to bleed. He then in anger put his hand to her face and tore the tissues of the inside of her mouth with his fingers. Blood flowed from this laceration also. She had ample opportunity to observe her assailant and she later unhesitatingly identified him from a group of several hundred workmen as they were entering the plant of the Babcock & Wilcox Company in Beaver Falls, on a change of shifts. Her description of the automobile, including the defective headlight, also identified the car of the defendant. Defendant on the trial admitted that he had driven from New Brighton to Ellport on the night in question but contends he was home in bed before 3 a.m. The wound on the middle finger of his left hand he attributed to a cut incurred while repairing an automobile. The testimony by which he attempted to set up an alibi was not impressive and the jury did not accept it.
The defendant here for the first time charges error in the instruction on reasonable doubt. He complains especially of the language of the trial judge in charging on reasonable doubt as ". . . that state of doubt . . . as would cause you to hesitate and refrain from action in your own affairs . . ." without referring such doubts to affairs of importance or of the highest importance. In Commonwealth v. Kluska, 333 Pa. 65, 3 A.2d 398, Mr. *580 Justice STERN, commenting on the language of prior decisions of our courts on reasonable doubt, said: "It may be doubted if the ordinary juror would appreciate the significance of these distinctions, and whether he would have the capacity to understand and the mental ingenuity to apply them. As a standard and approved form of charge, however, we are of opinion that the jury should be told either, as in the Andrews case,[1] that they should not condemn unless so convinced by the evidence that they would venture to act upon that conviction in matters of the highest importance to their own interests, or, as in the Green[2] and Jermyn[3] cases, that a reasonable doubt was one that would cause them to hesitate to act in any of the important affairs of their own lives."
There was a reversal in the Kluska case but it may be noted that though the instruction there did not meet the suggested standard, the reversal was not on that ground. Here the clear and instructive charge on reasonable doubt, quoted in full in the margin[4], adequately meets *581 the standard of the Kluska, Green and Jermyn cases, and that is all that can be required. This excerpt from the language of the trial judge to the jury: "Let us suppose that in some way the guilt or innocence of the defendant of these charges were involved in your own affairs; . . ." in considering the question of reasonable doubt, seems to be but another way of saying to the jury that they should not condemn unless they would act upon the conviction in matters of importance to themselves.
But in any view if the defendant considered the charge on reasonable doubt inadequate it was for him, when opportunity was afforded, to ask for amplification. At the close of the charge the trial judge inquired: "Are there now any matters which counsel would like to have called more specifically to the attention of the jury? Have there been any inadvertent mis-statements of the law or the evidence?" In response, defendant's counsel asked for clarification of certain factual issues but did not question the charge on the law. Only a general exception was taken and in the absence of a request for amplification, error, under the circumstances, cannot now be asserted to the charge on reasonable doubt. Commonwealth v. Glickstein, 151 Pa. Superior Ct. 421, 426, 30 A.2d 147; Commonwealth v. Kohl, 164 Pa. Superior Ct. 630, 634, 67 A. 2d 451.
An examination of defendant's automobile disclosed blood stains on the right side of the front seat cover, and there were similar blood stains on Mrs. Savicky's clothing. Samples of the blood of defendant and of Mrs. Savicky were taken and these specimens, together with the stained clothing and seat cover from the automobile, were examined by a specialist of the Federal Bureau of Investigation. *582 Defendant's blood was found to belong to International Blood Group O and Mrs. Savicky's blood to Group A. Evidence of these findings was admitted in evidence over defendant's objection that the taking of defendant's blood from his person was in violation of his privilege against self-incrimination. Although defendant did testify that the sample of blood was taken without his consent, there is no evidence that he protested or that it was taken against his will.
Even if this evidence were unlawfully obtained it is no objection to its admission (Commonwealth v. Dugan et al., 143 Pa. Superior Ct. 383, 18 A. 2d 84) unless defendant's constitutional privilege against self-incrimination was violated. The controlling principle in this case under the Pennsylvania rule, is thus discussed in Commonwealth v. Musto, 348 Pa. 300, 306, 35 A. 2d 307: "While the exact question thus presented [in that case, whether defendant charged with crime must submit to an examination as to his sanity] has apparently not been ruled upon by either of our appellate courts, it has arisen in many other jurisdictions, and these have quite uniformly held that the constitutional immunity from self-incrimination does not apply to a compulsory examination to determine the prisoner's physical or mental condition for the purpose of testifying in regard thereto, provided, of course, that he be not compelled to answer any questions propounded to him by those making the examination. The purpose of the constitutional provision is to prohibit the compulsory oral examination of the prisoner either before or at trial,  to prevent his being required to incriminate himself by speech or the equivalent of speech: Commonwealth v. Valeroso, 273 Pa. 213, 219, 220, 116 A. 828, 830. `The prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him; not an exclusion of his body as evidence when it may be material': per Mr. *583 Justice HOLMES in Holt v. United States, 218 U.S. 245, 252, 253. `Not compulsion alone is the component idea of the privilege, but testimonial compulsion . . . Unless some attempt is made to secure a communication, written or oral, upon which reliance is to be placed as involving his consciousness of the facts and the operations of his mind in expressing it, the demand made upon him is not a testimonial one': 8 Wigmore on Evidence (3rd ed.) 375, sec. 2265". (Emphasis ours.) The distinction may rest upon practical grounds, but certainly one lawfully arrested may not refuse to submit to finger printing, nor to a search of his person. So also the constitutional privilege does not allow a defendant to refuse a witness the opportunity of seeing him and hearing his voice, for the purpose of identification. Cf. Johnson v. The Commonwealth, 115 Pa. 369, 395, 9 A. 78. The privilege did not prevent the Commonwealth from requiring some of the defendants to stand in the presence of the jury, as they were identified by a witness in Commonwealth v. Safis et al., 122 Pa. Superior Ct. 333, 186 A. 177. Wigmore on Evidence, (3rd ed.) VIII contains a discussion of the subject and in § 2263 it is stated that historically the object of the privilege was to prohibit "the employment of legal process to extract from the person's own lips an admission of his guilt, which will thus take the place of other evidence". And Wigmore states the general principle of construction thus: "The privilege protects a person from any disclosure sought by legal process against him as a witness". In other words the protection afforded under the generally accepted rule, is a privilege against testimonial compulsion, and no more. While there is a conflict of authority outside of Pennsylvania as to whether anyone other than the accused may testify as to the result of blood tests, urine tests, or other physical examination of the accused made without his consent, in our opinion *584 the better considered cases hold that the privilege against self-incrimination is not thereby violated. See Annotation, 164 A.L.R. 967. Cf. State v. Cram, 176 Or. 577, 160 P. 2d 283; People v. One 1941 Mercury Sedan, 74 C.A. 2d 199, 168 P. 2d 443; State v. Ayres, 70 Idaho ___, 211 P. 2d 142; Ash v. State, 139 Texas Crim. Rep. 420, 141 S.W. 2d 341; Davis v. State, 189 Md. 640, 57 A.2d 289; State v. Sturtevant, 96 N.H. 99, 70 A. 2d 909.
The testimony of the blood tests in this case indicates that the blood stains on Mrs. Savicky's jacket were not from her bleeding mouth. Her blood was Type A and the stains were made by Type O blood, the type of the defendant's blood. Evidence of the result of these tests did not infringe on defendant's constitutional immunity from self-incrimination and was properly admitted as a circumstance bearing on the identification of the defendant, in corroboration of the testimony of the prosecuting witness that he was her assailant. Shanks v. State, 185 Md. 437, 45 A. 2d 85; Williams v. State, 143 Fla. 826, 197 So. 562; Kemp v. Government of Canal Zone, 167 F. 2d 938. Commonwealth v. English, 123 Pa. Superior Ct. 161, 186 A. 298, and Commonwealth v. Krutsick, 151 Pa. Superior Ct. 164, 30 A. 2d 325, relied upon by appellant are wholly inapplicable here. And the admissibility of this evidence is not affected by the fact that Type O blood is common to perhaps 45% of the people of the world. It was still competent as some evidence, just as evidence of how an assailant was dressed, however conventionally, would be competent though by no means conclusive of identity. The jury were carefully instructed as to the significance of this testimony by the trial judge in language quoted below.[5]
*585 The defendant's rights were respected throughout the trial of the case. We find no error in this record.
Judgment affirmed.
DISSENTING OPINION BY ROSS, J., May 25, 1950:
I dissent on the ground that it was error to admit testimony relative to the blood taken from the defendant against his will. In my opinion, this taking of his blood constituted an outrageous and unjustifiable violation of defendant's person.
I agree completely with Chief Justice BELT of the Oregon Supreme Court who in his dissenting opinion in State v. Cram (cited supra in the majority opinion) stated at page 292 of 160 P. 2d, page 963 of 164 A.L.R.: "To extract blood by hypodermic needle from a person accused of crime, without his consent . . . for the purpose of obtaining evidence to be used against him, shocks my sense of justice and decency."
NOTES
[1] Commonwealth v. Andrews, 234 Pa. 597, 608, 83 A. 412.
[2] Commonwealth v. Green, 292 Pa. 579, 591. 141 A. 624.
[3] Commonwealth v. Jermyn, 101 Pa. Superior Ct. 455.
[4] "This phrase `beyond a reasonable doubt' occasions some misapprehension. It does not mean beyond all doubt. It does not mean to a mathematical certainty. It does not mean that the jury should search through the evidence to find a doubt which does not naturally and intrinsically arise out of the evidence, in order to avoid the duty of convicting, which may be an unpleasant duty. In other words, before there should be a conviction in criminal cases the mind of the jury should have reached a state which is sometimes referred to as a state of conviction to a moral certainty. There is a practical test which I like to explain to jurors with reference to this matter of reasonable doubt. Let us suppose that in some way the guilt or innocence of the defendant of these charges were involved in your own affairs; and if after a careful survey of the evidence the jury finds that their minds are wavering and uncertain and unable to reach a satisfactory conclusion; and if that state of doubt is such as would cause you to hesitate and refrain from action in your own affairs, then you may be said to have a reasonable doubt, of which the defendant is entitled to the benefit by an acquittal. If, on the other hand, after a careful survey of all the evidence the mind of the jury settles down into a clear and calm and complete conviction of guilt, if you are convinced to the point which would allow you or move you to act in your own affairs, then you may be said to be free from reasonable doubt."
[5] "Another type of evidence which merits further observation is the evidence concerning these blood types. You have here in evidence before you the testimony of two persons whom we found to be of sufficient experience in determining human blood types as to make their opinions of value to you. These persons were the chemist down at the local hospital, Peter C. Mancino; and the expert from Washington, R.E. Duckett. It is clear from their testimony that human blood, at least blood of human beings in this country, is divided into four types, A, O, B, and AB. The evidence is that blood was found on a seat cover and on certain garments of the lady, Hope Ann Savicky. We allowed these witnesses to testify concerning the blood types of samples of blood from various places. We also allowed in evidence their conclusions about the blood, or type of blood of Mrs. Savicky and the type of blood of the defendant, Mr. Statti. You must understand that under some circumstances those tests might be conclusive. If, for example, the blood found about the person of this lady, other than her own blood, was of a type not the type of the defendant, then that would constitute scientific proof that the defendant wasn't there. Now, when the contrary is true, if there is blood of the same type as the blood of the defendant found about the person and garments of Mrs. Savicky, you are not to conclude in the same fashion that that means it was of necessity the defendant's blood. It is merely a circumstance given to you in corroboration of the testimony of Mrs. Savicky. I am speaking about this at this time in order that you will not conclude in a summary and wholesale fashion that the circumstance is decisive. It is submitted to you only under what we believe to be careful instructions to avoid your giving to it more weight than it justly merits."