## Commonwealth v. Tunstall

*Curtis C. Carson, Jr.*, and *Victor Wright*, assistant district attorney; *Michael von Moschzisker*, first assistant district attorney, and *Richardson Dilworth*, district attorney, for Commonwealth.

*Schmidt, Green, Harris & Higginbotham*, for defendant.

KLEIN, P. J. (specially presiding), October 8, 1954. —Calvin Tunstall, defendant, was tried without a jury and convicted of illegally maintaining a lottery. Defendant moved for a new trial and in arrest of judgment.

A study of the testimony discloses that on October 2, 1953, a search-and-seizure warrant was obtained by the police to search defendant's residence, 3915 Wallace Street, Philadelphia. On this day Police Officer William Jennings, in company with Police Officer Haywood, arrested defendant while he was seated in an

automobile on Thirty-ninth Street, about three quarters of a block from his home. As the police officer approached defendant, he placed a piece of paper in his mouth. Officer Jennings testified that he put his arm around defendant's neck and used force to take a slip of paper from defendant's mouth. The slip contained 14 straight number plays.

Inside the door, beneath a mail box slot, in defendant's residence, which he occupied with his wife, the police officer found "one cigarette silver back of a pack containing six yellow bankers slips with 130 straight number plays and two code writers 26 and 26-A". Seven dollars in change was taken from defendant.

Defendant was then taken to police headquarters where he admitted that the money which was taken from him was "lottery money". He refused, however, "to make a signed statement".

Counsel for defendant contends vigorously that the removal of the slip of paper from defendant's mouth by force was in disregard of his rights of due process of law and that the court erred in admitting this paper in evidence. He contends further that the Commonwealth's evidence, exclusive of this piece of paper, was insufficient to sustain a verdict of guilty.

Two completely divergent rules have evolved and are being followed in this country with respect to admissibility of evidence, which establishes the commission of a crime, obtained by illegal means.

The Federal rule holds flatly that such evidence is inadmissible: Weeks v. United States, 232 U. S. 383 (1914). Seventeen States have adopted the Federal rule.* A majority, however, 32 in number, have rejected the Federal rule and hold that the manner of obtaining evidence has no bearing on its admissibility.

---

* See appendix to Wolf v. Colorado, 338 U. S. 25, 33 (1949), in which the States which reject the Weeks doctrine, as well as those which are in agreement with it, are tabulated.

Pennsylvania is in this latter group. See Commonwealth v. Dabbierio, 290 Pa. 174, 179 (1927). See, also, Commonwealth v. Grasse, 80 Pa. Superior Ct. 480, 484 (1923) ; Commonwealth v. Rubin, 82 Pa. Superior Ct. 315 (1923) ; Commonwealth v. Schwartz, 82 Pa. Superior Ct. 369 (1923) ; Commonwealth v. Dugan et al., 143 Pa. Superior Ct. 383, 386 (1940), and Commonwealth v. Statti, 166 Pa. Superior Ct. 577 (1950).

In Wolf v. Colorado, 338 U. S. 25 (1949), the Supreme Court of the United States held that although the doctrine of Weeks v. United States, supra, making evidence secured in violation of the fourteenth amendment inadmissible in Federal courts is adhered to, it is not imposed on the States by the fourteenth amendment. They therefore affirmed a conviction obtained in a State court for a State crime even though it was based upon evidence obtained as the result of an unreasonable search and seizure.

Counsel for defendant relies principally upon Rochin v. California, 342 U. S. 165 (1952), which he contends is controlling and changes the rule of Wolf v. Colorado, supra.

In the Rochin case, three deputy sheriffs of Los Angeles County, having some information that defendant was selling narcotics, entered the dwelling house in which he was living, without a warrant, and then forced open the door to his room on the second floor. Inside they found defendant partly dressed sitting on the side of the bed on which his wife was lying. On the "night stand" beside the bed the deputy spied two capsules, which defendant seized and put in his mouth. A struggle ensued, in the course of which the three officers "jumped upon him" and attempted to extract the capsules. The force they applied proved unavailing against his resistance, whereupon he was handcuffed and taken to the hospital. At the direction of one of

the officers a doctor forced an emetic through a tube into defendant's stomach against his will. This "stomach pumping" produced vomiting and in the matter ejected were found two capsules which proved to contain morphine.

Defendant was brought to trial before a California Superior Court, sitting without a jury, on a charge of possessing "a preparation of morphine" in violation of a California statute. He was convicted and sentenced to 60 days' imprisonment. The chief evidence against him, admitted over defendant's objection, was the two capsules. The means by which this evidence was obtained was frankly admitted by the State's witnesses.

The conviction was affirmed by the appellate courts of California. On appeal to the United States Supreme Court the conviction was set aside on the ground that the evidence was obtained by methods violative of the due process clause of the fourteenth amendment.

Mr. Justice Frankfurter, who delivered the opinion for the United States Supreme Court, said, at page 172:

". . . we are compelled to conclude that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically. This is conduct that shocks the conscience. Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents—this course of proceeding by agents of government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation."

It is obvious that the officers in the Rochin case were guilty of a shocking series of violations of defendant's constitutional rights. This is not the situation in the present case. Although the arresting police officers are not to be commended for their overzealousness, their

conduct cannot be compared to the outrageous treatment of defendant Rochin.

It seems evident that the Supreme Court did not intend in the Rochin case to overthrow the well-entrenched rule of law prevailing in most of the States with respect to the admissibility of testimony obtained by illegal means. This is the only logical inference to be drawn from the following statement, which appears at page 174:

"In deciding this case we do not heedlessly bring into question decisions in many States dealing with essentially different, even if related, problems. We therefore put to one side cases which have arisen in the State courts through use of modern methods and devices for discovering wrongdoers and bringing them to book. It does not fairly represent these decisions to suggest that they legalize force so brutal and so offensive to human dignity in securing evidence from a suspect as is revealed by this record. . . .

"We are not unmindful that hypothetical situations can be conjured up, shading imperceptibly from the circumstances of this case and by gradations producing practical differences despite seemingly logical extensions. But the Constitution is 'intended to preserve practical and substantial rights, not to maintain theories.' Davis v. Mills, 194 U. S. 451, 457."

We, therefore, conclude that the rule of the Rochin case should be restricted to cases in which the arresting officers are guilty of shocking brutality. It is difficult to define with particularity the precise degree of abuse or mistreatment which will be held to bring the rule into play. Each case must be studied in the light of its own facts. It seems clear, however, that such acts, for example, as frisking a defendant for concealed weapons, searching his inner garments, compelling him to empty his pockets or opening a clenched fist by force, are not the sort of police conduct which the Supreme

Court had in mind. We include in this category re-
moving a slip of paper from defendant's mouth under
the circumstances of the present case.

We, therefore, conclude that no error was committed
in admitting in evidence the slip of paper containing
the 14 number plays. With this evidence in the record,
the charge against defendant of illegally maintaining
a lottery was sufficiently established: Commonwealth
v. Oxman, 173 Pa. Superior Ct. 482 (1953). The ver-
dict of guilty was proper.

The motions for a new trial and in arrest of judg-
ment are therefore dismissed.