## Commonwealth v. Linn

*James F. Malone, Jr.*, district attorney, and *Sidney A. Sanes*, assistant district attorney, for Commonwealth.

*Louis C. Glasso*, for defendant.

MONTGOMERY, J., February 4, 1955.— Prisoner George E. Linn has been charged with the crime of assault with intent to kill after shooting one Edward G. Bothwell on June 6, 1954. After his arrest a question as to his sanity was brought to the attention of one of the judges of the Court of Oyer and Terminer and Quarter Sessions of Allegheny County and, by order of court, he was given a psychiatric examination by the Behavior Clinic of Allegheny County. On the basis of this examination and his appearance before the court, it appeared that he might be in need of hospitalization for mental treatment, and therefore a petition was filed by the warden of the Allegheny County jail at the direction of the court under section 342 of the Mental Health Act of June 12, 1951, P. L. 533, as amended, 50 PS §1222, to have him committed to a mental hospital for care.

In compliance with this petition the court appointed a commission consisting of two psychiatrists, Doctors Shrode and Henninger, and P. J. Corr, a member of the bar of Allegheny County, who, after making examination of Linn in the presence of his counsel, reported that he was mentally ill, and of criminal tendency, and recommended that he be committed to a

hospital for mental illnesses. After receiving this report, the court conducted hearings at which the prisoner was present and represented by counsel who interrogated members of the commission and offered testimony of witnesses and of the prisoner. Further, Linn was afforded the opportunity of being examined by doctors of his own choosing, but they did not appear and testify although they had made their examinations.

At the conclusion of these hearings, motions were made by counsel for Linn:

1. To quash this proceeding because the provisions of the Mental Health Act had not been complied with and because of the violation of his constitutional rights granting immunity from self-incrimination (he having been compelled to submit to psychiatric examination).

2. For a jury trial to determine his mental condition.

It is asserted by the prisoner that the determination of his mental condition, and subsequent commitment to a mental hospital, without first affording a trial by jury on the issue of insanity, is violative of the due process clause of the Pennsylvania Constitution. In support of this contention, he relies on article I, sec. 6, of the Constitution of 1874 which provides that "trial by jury shall be as heretofore and the right thereof remain inviolate". The principal issue then is whether or not this constitutional mandate requires that the question of a person's insanity be determined in a trial by jury where the purpose of the inquiry is to decide if such person should be institutionalized for treatment and care. In the opinion of this court the right to a trial by jury on this question is not secured by the Constitution.

It is the law in Pennsylvania that the right to trial by jury, as guaranteed by the Constitution, means the right as it existed in this State at the adoption of the Constitution: Byers and Davis v. Commonwealth, 6

Wright 89 (1862). The answer to the present inquiry, therefore, depends primarily upon the right to trial by jury as it existed and was recognized at common law. In the earliest days of the common-law, jury trial to determine insanity was afforded, because insanity was considered a permanently disabling condition, the adjudication of which passed the issues and profits of the lunatic's estate to the king. Later, when it was discovered that the disability was not always permanent, provision was made for the safekeeping of an incompetent's estate during the period of his incompetency and its subsequent restoration to him or devolution to his heirs upon death. It was then that differences in procedure for determining the issue of insanity began to arise, these differences being to a large extent dependent upon the purpose for which the inquisition was conducted. Thus, where it was sought to have a person adjudged insane in order to have a guardian appointed for his person and property, and thereby preserve his estate, the early states provided for a right to traverse the findings of an inquisition and to a trial by jury in a court of law. But, where the reason for conducting the inquiry was to establish a basis for commitment of an alleged lunatic to a hospital or other institution for treatment, the right did not exist.

Although not readily apparent, the distinction probably has its foundation in the early common-law concepts of property rights, especially the rights of freeholders in their real estate. So great was the importance attached to the incidents of ownership of property and the rights of a man in his estate that any issue which would deprive him thereof was cautiously determined. Accordingly, the Statute of 2d and 3d Edw. III, c. 8, §6, provided for a right to jury trial when the control of the alleged lunatic's estate was in issue, and it is after this statute that the Act of June

13, 1836, P. L. 589; the Act of May 28, 1907, P. L. 292, sec. 4, 50 PS §944, and the Incompetents' Estates Act of June 28, 1951, P. L. 612, 50 PS §1631 et seq., are modeled. Therefore, even today, by virtue of the Act of 1907, a person is entitled to a trial by jury on the issue of his incompetency where control of or disposition of his estate is in question. If the proceedings result in a conclusion of incompetency jurisdiction of the incompetent's *estate* is vested in the court.

However, in the early law, proceedings initiated to commit an alleged lunatic to an institution were usually summary in nature, the fact of insanity being determined by the chancellor upon the petition of interested parties. Gradually, the courts of chancellory devised new procedures for handling the problem and thus the appointment of a commission to make the inquiry and reach findings came into use. Here, the question, although basically one of sanity or insanity, was more fundamental in that the inquiry was directed toward a determination of whether confinement and treatment were necessary. Only one fact was made essential, that it is a suitable case for confinement. Thus, the Act of April 20, 1869, P. L. 78, provided for the ascertainment of insanity without the aid of a jury trial, and for subsequent commitment of the lunatic to a suitable institution. This act was the forerunner of the Mental Health Act of July 11, 1923, P. L. 998, and of those provisions of the Mental Health Act of 1951 now in controversy.

An excellent discussion contrasting the two types of insanity proceedings is contained in Halderman's Appeal, 104 Pa. 251 (1883), where the court, on page 260, observed:

". . . The object of the one widely differs from the object of the other, and so also the mode of procedure.

"The Act of 1869 authorizes and requires any judge or any court upon complaint respecting an insane

person, or upon statement respecting an alleged insane person, setting forth certain facts, to take speedy action for a hearing and ascertaining of the facts, and thereupon to make the proper order as the case may demand, either for the committal or discharge of such person. It was passed for the purposes therein expressed; not to simplify the cumbrous and dilatory proceedings under the Act of 1836, nor to confer jurisdiction over the estate of the lunatic. It provides nothing respecting the care of the lunatic's estate; nor for notices, nor for inquisition of material facts respecting the lunatic, his estate, his heirs or next of kin, for information of the court and of the committee to be appointed."

The distinction appears logical since a jury of 12 good men may well be qualified to determine if a person is capable of handling his own estate, but where mental treatment and rehabilitation is the issue, a commission of experts would seem the better choice.

The majority of the decided cases in regard to the determination of insanity were proceedings by the king to control a person's property, and are, therefore, no authority in the controversy now before this court. But, it is in these cases, and statutes to the same effect, that the argument that jury trial is necessary seems to find support. As indicated above, however, further study discloses that where the question of lunacy arose only as a question of confinement to prevent harm to the subject or to society as a whole, there existed at common law statutes which granted authority to justices of the peace to issue warrants and confine dangerous lunatics: Statute of 1714, 12 Anne, St. 2, ch. 23; Statute of 1744, 17 Geo., 2, ch. 5. For analogous laws in Pennsylvania, see Ex parte Crouse, 4 Wharton 9, and Byers and Davis v. Commonwealth, supra.

On the basis of the foregoing reasoning we can only conclude that a jury trial is not constitutionally re-

quired in the present proceedings. Violation of the Federal Constitution is likewise not involved, since this question of a right to jury trial was decided negatively in cases alleging lack of due process under the fifth, seventh and fourteenth amendments. See Montana Company v. St. Louis Mining and Milling Co., 152 U. S. 160; Simon v. Craft, 182 U. S. 427; Adamson v. California, 332 U. S. 46.

In the main, the argument propounded by the prisoner and the authority cited in support thereof concerns the right of an accused to trial by jury on the question of sanity prior to the beginning of a criminal prosecution. Cases where this question is involved concern the right of the Commonwealth to proceed with the criminal prosecution of a person claiming to be insane, without first presenting the issue of insanity to a special jury convened to try that fact. These cases unanimously hold that the method of determining the preliminary fact of insanity was within the discretion of the trial court and that defendant's rights were not violated if the question of insanity was not determined preliminarily, since that fact could properly be decided by the jury trying the indictment: Webber v. Commonwealth, 119 Pa. 223; Commonwealth v. Scovern, 292 Pa. 26. The Procedure Act of 1860, P. L. 427, 19 PS §1352, was obviously passed to assist the criminal courts in handling such problems. Neither the statute nor these cases pertain to or involve any proceedings under the Mental Health Act.

It is elementary that where the sanity of a criminal defendant is an issue in the prosecution of a case against him a trial by jury on such issue is constitutionally guaranteed. Any element of defense which bears on the guilt of a defendant in a criminal case must, at defendant's request, be determined by a jury. But here, the fact that a crime was committed is irrelevant to a decision of the controversy. The issue

is whether under the Mental Health Act of 1951, Linn, or *any* other person, can be committed as a patient to a hospital without the intervention of a jury to determine his sanity. We think he can.

The primary purpose of the Mental Health Act, as well as other prior acts was to provide hospitalization, care and rehabilitation for mental defectives. The commitment and care of these persons is a proper exercise of police power vested in the legislature for the health, welfare, and safety of society. The act prescribes an orderly and adequate method of determining who are proper subjects for detention, with sufficient safeguards to provide against injustices. The reason for such detention is not for punishment but rather for the benefit of the patient and society.

Prisoner further contends that since the petition for commitment was not accompanied by the sworn affidavits of two qualified physicians, as required by section 1201 (*d*) of the Mental Health Act, the proceedings are void and ought to be quashed. We are unable to perceive any merit in this contention. Granted that two affidavits are required, it seems to us that his appearance in court by his counsel, and his being heard in person, waived any defects as to form or procedure. As early as In re Lincoln, 1 Brewster 392 (1867), it was held that the absence of a supporting affidavit, similar to that required here, was waived by going to trial. At any rate, prisoner's rights were adequately protected at each stage of the proceedings, and he cannot now assert the lack of procedural due process.

Finally, prisoner asserts that his rights were violated by reason of the fact that he was compelled to testify against himself. Such testimony was elicited from Linn in a psychiatric examination by the commission appointed to determine his sanity. These proceedings

were in no way in the nature of a criminal trial and no criminal charge is here involved. Nor is the commitment under these proceedings of a penal nature. Under such circumstances the constitutional privilege against self incrimination has not been violated. See Commonwealth v. Statti, 166 Pa. Superior Ct. 577, 582. Further, he volunteered to testify at the hearing at which he was represented by counsel.

Orders will be made dismissing the motions ex parte defendant to quash these proceedings and for a trial by jury on his mental condition, confirming the report of the commission and adopting the recommendation that George E. Linn be committed to a mental hospital for observation, diagnosis and treatment.

### Orders of Court

And now, to wit, February 4, 1955, after a consideration of the briefs presented by the parties, and the oral arguments of counsel, it is hereby ordered and decreed that the motions of George E. Linn for the impaneling of a jury to pass upon his sanity be and is hereby denied, and his further motion to quash these proceedings is also denied.

And now, to wit, February 4, 1955, upon consideration of the written report of the commission appointed by this court, said commission consisting of two psychiatrists, Doctors Shrode and Henninger, and P. J. Corr, a member of the bar of Allegheny County, the court finds that George E. Linn, the above-named prisoner, is mentally ill and that he is of criminal tendency. Accordingly, the court directs that George E. Linn be committed to the Farview State Hospital, Waymart, Pa., to be there detained and treated as a mentally ill person at the expense of the Commonwealth of Pennsylvania, and that Allegheny County pay the cost of this proceeding, including the expense of removing the prisoner to the hospital.