## Commonwealth v. Neal

*Charles J. Bogdanoff*, for Commonwealth.

*Milton S. Leidner*, for defendant.

GRIFFITHS, J., May 28, 1964.—In this matter application was made to the court to remove a strand of de-

fendant's hair to compare it with strands of hair found on masks and a jacket, found at the scenes of robberies. Objection has been raised by defendant that removal of hair from his head, contrary to his will, constitutes a violation of his rights granting him immunity from self-incrimination.

There was a time in English legal history when the common law permitted questions to be asked an accused. Late in the Sixteenth Century, primarily in opposition to methods used in ecclesiastical courts, there arose the maxim, "no man is bound to accuse himself." What the maxim originally stood for was that no man can be brought to trial without first having been properly accused by the grand jury. Most of the present day corollaries of the maxim, however, had no significance until 1660: 8 Wigmore, Evidence §2250, et seq (McNaughton rev. 1961); Corwin, The Supreme Court's Construction of the Self-Incrimination Clause, 29 Mich. Law Review, 1-27, 191-207 (1930).

Refusal of a witness to give testimony that may be used presently or in the future to incriminate him, is the immunity guaranteed: McCarthy v. Arndstein, 266 U. S. 34, 40 (1924); and cf. Boyd v. United States, 116 U. S. 616 (1886); Counselman v. Hitchcock, 142 U. S. 562 (1892); Brown v. Walker, 161 U. S. 591 (1896).

It has been clearly established by many decisions that the immunity relates to *oral*, not physical, examination. Thus, former Mr. Chief Justice Stern wrote for the court in Commonwealth v. Musto, 348 Pa. 300, 306-07 (1944):

"The purpose of the constitutional provision is to prohibit the compulsory oral examination of the prisoner either before or at trial,—to prevent his being required to incriminate himself by speech or the equivalent of speech: Commonwealth v. Valeroso, 273 Pa. 213, 219, 220, 116 A. 828, 830. 'The prohibition of compelling a man in a criminal court to be witness against

himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material': per Mr. Justice Holmes in Holt v. United States, 218 U. S. 245, 252, 253. *'Not compulsion alone is the component idea of the privilege, but testimonial compulsion. . . .* Unless some attempt is made to secure a communication, written or oral, upon which reliance is to be placed as involving his consciousness of the facts and the operations of his mind in expressing it, the demand made upon him is not a testimonial one': 8 Wigmore on Evidence (3d ed.) 375, sec. 2265." (Italics supplied.)

Your honorable court stated in Commonwealth v. Statti, 166 Pa. Superior Ct. 577, 583 (1950) :

". . . certainly one lawfully arrested may not refuse to submit to finger printing, nor to a search of his person. So also the constitutional privilege does not allow a defendant to refuse a witness the opportunity of seeing him and hearing his voice, for the purpose of identification. Cf. Johnson v. The Commonwealth, 115 Pa. 369, 395, 9 A. 78. The privilege did not prevent the Commonwealth from requiring some of the defendants to stand in the presence of the jury, as they were identified by a witness in Commonwealth v. Safis et al., 122 Pa. Superior Ct. 333, 186 A. 177."

Again, in Commonwealth v. Tunstall, 178 Pa. Superior Ct. 359, 363 (1955), your honorable court stated:

"The instruments or devices of crime found upon the person of one charged with crime are legitimate evidence and may be taken from a defendant and used for that purpose. Com. ex rel. v. Keister, 289 Pa. 225, 229, 230, 137 A. 223. Evidence in the form of number slips taken from a defendant's pocket and hat band has been held admissible. Com. v. Adams, 174 Pa. Superior Ct. 504, 102 A. 2d 202. In the present case the evidence ad-

mitted was not obtained as the result of any procedure which shocks the conscience or violates appellant's fundamental constitutional rights."

See also Commonwealth v. Kravitz, 400 Pa. 198 (1960).

We thus concluded that the cutting of a strand of hair did not constitute oral examination, in the first place, and, secondly, even though it were compulsory, "not compulsion alone is the component idea of the privilege," in the words of Wigmore, as adopted by our Supreme Court in Commonwealth v. Musto, supra.

No one would gainsay that *compulsory fingerprinting, compulsory searching of the person,* and *compulsory confiscation of devices of crime,* among other compulsions employed in ferreting out crime and the criminal, are lawful. In the Musto case it was held in broad language that compulsory examination to determine defendant's physical condition for the purpose of testifying thereto is proper. We believe cutting hair for testing is examination of such physical condition. Unless one is a Nazarite (Numbers 6:1-23) such as Samson (Judges 13:5), whose religious orders and whose strength related to his hair (Judges 16:17), there is nothing sacred about a strand of hair cut in this case and retained by this court pending disposition of the matter, under agreement of counsel and defendant. Some men get a haircut weekly, some biweekly, some monthly or longer, depending on personal preferences, but haircuts are customary. Nor can the cutting of hair, common among men, be equated with pumping out the stomach, which is quite uncommon: Rochin v. California, 342 U. S. 165 (1952).

It is well known that the structure of hair is of such nature that it is examinable for distinctions. By reason of structural features of specimens, such as those taken from the masks, jacket and the defendant's head, W. E. Evans, M.D., of the University of London, has

written in the authoritative treatise, *Legal Medicine*, edited by R. B. H. Gradwohl, that by reason of the technique of microscopy and photographic study as well as other procedures, hair "can be of considerable importance in scientific criminal investigation," p. 479.

The complete hair consists of a root and a shaft with a tip. The shaft contains an outer part, known as the cuticular layer, beneath which is the cortex with a central medulla terminating in a pointed tip. The cuticular scales themselves are utilized to provide two systems of classifications. (Op. cit. 485.) Detailed studies can be made of the pigment granules in the cortex (493). Studies of the medullary detail help in making distinctions (492).

As was stated by Dr. Evans in his treatise of 16 pages on hair contained in the above cited volume of several hundred pages, "A feature of hair is its durability, and the main details may still be demonstrable after very many years. Examinations of mummy hair have disclosed recognizable structural details." (495)

On May 19, 1964, the Honorable Abraham L. Freedman, in the U. S. District Court for the Eastern District of Pennsylvania, in Butler v. Crumlish, 229 F. Supp. 565, preliminarily enjoined the district attorney and the police commissioner from bringing plaintiffs, arrested and incarcerated without bail, into a police line-up "for possible identification by victims." The case was decided by reason of the Eighth Amendment to the Constitution of the United States, a similar provision being in the Pennsylvania Constitution of 1874, prohibiting excessive bail, and absorption of such amendment by the Fourteenth Amendment providing for "equal protection of the laws." Specifically, Judge Freedman held that a defendant on bail did not have to submit to a "line-up" by police, although presumably he could be viewed as he walked along the street, and a defendant while imprisoned awaiting trial was guar-

anteed such equal protection and, therefore, did not have to submit to a "line-up" in a prison or detention center, although, he wrote, there are "opportunities for observation of suspects by complainants which are broader than in the case of those who are free on bail."

If a police "line-up" is improper, does a defendant now have to submit to finger-printing? or to taking of a photograph? or to compulsory searching of his person? or to surrendering the impliments of crime? They are all part of police investigation. There seems little or no distinction between them in legal significance. We agree with your honorable court that the answer to such inquiries is, "Did the procedure shock the conscience or interfere with fundamental constitutional rights?": Commonwealth v. Tunstall, supra.

Because of the above queries we raise, we feel it incumbent upon us to comment further in regard to Butler v. Crumlish, Jr., supra, as follows: (1) It is only "a preliminary injunction—to preserve the status quo pending final hearing"; (2) it was decided only under the equal protection clause of the Fourteenth Amendment; (3) the guarantee against self-incrimination of the Federal and Pennsylvania Constitutions was not decided, by the express limiting language contained in the next to the last paragraph of the opinion; (4) the decision is not controlling in this case. We have cited it here because it was mentioned in the argument before us, at that time it being as yet undecided, and your honorable court might conceive of it as analogous.

For the foregoing reasons we entered an order allowing a strand of hair to be cut from defendant's head. His own counsel, with his consent, then cut seven such strands, which, as above noted, we are holding subject to disposition of the matter.